NORTHWEST FINANCIAL AGENCY, INC., Plaintiff,

v.

TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY, et al., Defendants.

No. C2-91-383.

United States District Court, S.D. Ohio, E.D.

Sept. 5, 1991.

Mark S. Miller, and James Leickly, Luper Wolinetz Sheriff & Neidenthal, Columbus, Ohio, for plaintiff.

Thomas Young, Porter Wright Morris and Arthur, Columbus, Ohio, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court pursuant to the motion of Plaintiff Northwest Financial Agency, Inc. ("Northwest") for a preliminary injunction to enjoin the defendants, Transamerica Occidental Life Insurance Company, Transamerica Assurance Company, and Transamerica Life Insurance and Annuity Company (collectively referred to hereinafter as "Transamerica") from terminating a General Agent and Agent employment relationship with Northwest Fed.R.Civ.P. 65. Northwest alleges that the termination of the relationships was unlawful and as such must be enjoined.

The Complaint was originally filed in the Franklin County Common Pleas Court. The defendants removed the action to this Court under 28 U.S.C. § 1441, et seq., stating that this Court has jurisdiction pursuant to 28 U.S.C. § 1332. In the Verified Complaint filed with the Court, Northwest asserts a claim for relief under a breach of contract argument concerning the General Agency agreement and the Agency agreement, fraudulent misrepresentation, breach of good faith under the contracts and "malicious breach" of an oral agreement allegedly entered into on April 29, 1991.

## I. FACTS

The Plaintiff, Northwest Financial Agency, Inc., is a business licensed to sell insurance in the State of Ohio. The key employee and essentially the alter ego of the corporate entity is Samuel L. Farb, Sr. ("Farb"). He is an individual with twenty-three (23) years of experience in insurance sales. He is the main producer or salesman for Northwest and was the president of the business. According to the plain-

tiff's Complaint, Farb has existing clients who pay approximately Three Million Dollars ($3,000,000) in annual insurance premiums. By virtue of the Three Million Dollars worth of premiums it cannot be contested that Farb has enjoyed a successful career as an insurance salesman.

In late 1988 and early 1989 Farb had become concerned that the insurance company through which he did most of his business, First Capital Insurance, was no longer stable, therefore, he had become interested in placing his business with another, more stable, insurance company. Transamerica was the company that Farb elected to do business with.

On or about June 1, 1989, Plaintiff Northwest entered into a General Agent's Contract with Transamerica. Under the General Agent's Contract, Northwest was to maintain an office and staff, as well as hire, train, and supervise individuals to sell the Transamerica products. In order to help Farb establish the office Transamerica agreed to advance $20,000 per month. This money was extended to defray the costs of overhead while the business was in its infancy. Under paragraph 2 of the General Agent's Contract it provides as follows:

> The personal business of the General Agent shall be written and produced under a separate agent's contract with the Company, herein referred to as the Agent's Contract. The General Agent, therefore, shall also be an agent of the Company, subject in that capacity to all of the terms and conditions without exception of such Agent's Contract and any other agent's agreement now or at any time hereafter in force between the Company and the General Agent.

Therefore, pursuant to the above provision an Agent's Contract was executed on June 1, 1989, between Northwest and Transamerica.

At some point the relationship between Northwest and Transamerica deteriorated. Northwest contends that Transamerica was failing to properly and timely issue policies as promised, while Transamerica appears to allege that they were concerned with the large amount of money that had been extended to Farb to start Northwest and that working with Farb and his perpetual complaints was, euphemistically, unpleasant. Furthermore, Farb alleges that Transamerica was improperly withholding moneys due and owing and was improperly crediting the accounts of the General Agency and some of the agents. Nonetheless, the friction escalated rapidly with correspondence between the parties.

On November 9, 1990, Farb sent a letter to the Chief Executive Officer of Transamerica, David Carpenter. Although Farb had never had any dealings with Carpenter it was apparently his attempt to take his complaints to "the top". In the letter Farb resigned as president of Northwest and took the opportunity to inform the CEO of "[t]he inability for (sic) the people at Transamerica home office to feel the same sense of urgency to complete projects, underwrite cases, and correctly check to assure the agent and the agency are maximizing profit potential ..."

Farb followed up the November 9th letter with a second letter on March 28, 1991. In the second letter he expressed his dismay with the resignation of an employee of Transamerica that Farb obviously believed was a key employee. He stated, "I can only believe that the loss of such a loyal employee could have been caused by the antiquated thinking and lack of urgency to get things done that is shown throughout all levels of management at Transamerica." These letters represent only a modest indication of the correspondences sent by Farb and the telephone calls to the representatives of Transamerica concerning what Farb believed to be errors, mistakes and general apathy by Transamerica in servicing his clients after he had sold the product. It should be noted that the Court is not stating a position concerning whether the alleged aggravation caused by Transamerica's alleged inaction on those matters which Farb believes to be imperative are a justification for the correspondences, or whether these alleged failures will give rise to a cause of action. This will be an issue for a jury. Nonetheless, these facts reflect the circumstances, the tone of the conver-

sations exchanged and the overall climate surrounding the parties' relationship. It lends relativity to the actions of Northwest and Transamerica.

On April 4, 1991, the friction in the relationship between the two parties came to a head. Farb sent a letter to Transamerica that provided in part as follows:

We have shown you sufficient prove (sic) that the lackadaisical attitude of you and your employees has caused business not to be paid on (sic) a prudent manner. This leads be to believe that Transamerica has not been acting on my behave. (sic) . . .

Effective immediately I resign as General Agent for Transamerica. If the terms of this letter are not taken into account and the monies I am owed, as outlined are not received by April 5, 1991, I will proceed accordingly.

In response to the April 4 letter, Transamerica sent a letter on April 5, 1991, stating that, "[w]e hereby officially accept your letter of resignation immediately and will date the termination request as of the date of your letter, April 4, 1991." With that, the relationship came to an abrupt end. The record reflects that the parties continued to exchange terse letters concerning monies owed, accounting procedures utilized and other monetary related matters.

On or about April 12, 1991, all Agent's Contracts between Transamerica and the individual employees of Northwest, and specifically, Sam Farb, Sr., were terminated. Furthermore, in a letter also dated April 12, 1991, Transamerica advised Farb that "[i]n accepting your letter of resignation as a General Agent with Transamerica Life Companies, it should be made clear that this includes the termination of your Agent Contract as well." See Exhibit F as attached to the original complaint.

A couple of weeks later, Transamerica reinstated all of the agents previously employed by Northwest and placed them with another General Agent in Columbus. It is through these agents that Transamerica states that the policyholders, bought to Transamerica by Farb, could be serviced.

Transamerica states that the individual policyholders can be serviced in one of two ways; either Farb can request and receive information on Transamerica products and can facilitate in alterations to the original policies purchased, but cannot sell new Transamerica products, or the client can contact the new agent for the same information or have new Transamerica products sold to him or her.

On April 29, 1991, Bill Harrison, the sole owner of General Insurance Consultants Agency Inc. traveled to Los Angeles to discuss reinstatement of Northwest's Agency Contract under a new agency headed by him. He met with representatives from Transamerica and a tentative agreement was reached, albeit it was not reduced to writing. By virtue of Harrison's own testimony at the preliminary injunction hearing, the agreement had to be approved by supervisors, specifically, George Thomas. Harrison stated that he thought Thomas' approval would merely be a "rubber stamp". It is Transamerica's position that some of the provisions in the agreement were not acceptable to Thomas and he refused to ratify it.

On May 7, 1991, Harrison sent a letter to Transamerica setting forth the provisions he believed the parties had agreed upon. The letter concluded by stating that "[t]his letter of understanding must be countersigned and faxed to Northwest by 9:00 a.m., May 8, 1991. If it is not, Northwest Financial intends to file suit[.] Jim Solstice has been so advised." The agreement was not executed by Transamerica and instead the ultimatum, according to Transamerica, served to only exacerbate the circumstances. Transamerica's response was to terminate The Agent's Agreements with Harrison and his counterpart, General Insurance Consultants Agency, Inc.

Northwest explains the actions of Transamerica by surmising that "[a]pparently, several individuals at Transamerica became perturbed with Sam Farb because he questioned their ability to get their jobs done and made sure that their superiors knew about it." See Brief in Support of Motion

for Preliminary Injunction at p. 2.[1] Nonetheless, the result of the parties' constant altercations was to sever all relationships. It is the severing of these relationships, as General Agent and as Agent, that Northwest requests this Court enjoin.

## II. STANDARD FOR PRELIMINARY INJUNCTIONS

In determining whether a preliminary injunction is appropriate the Court must consider and weigh four factors:

First, whether the movant has shown a "strong or substantial likelihood or probability of success on the merits";

Second, whether the issuance of an injunction will spare the movant from suffering "irreparable injury";

Third, "whether the issuance of a preliminary injunction would cause substantial harm to others"; and

Fourth, "whether the public interest would be served by issuing a preliminary injunction."

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). *See also, e.g., Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985) (Lanham Act, 15 U.S.C. § 1125(a)); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985); *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 564–65 (6th Cir.1982); *USACO Coal Co. v. Carbomin Energy Inc.,* 689 F.2d 94, 98 (6th Cir.1982); and *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 368 (6th Cir.1981).

It has long been established that the four factors to be considered are not a "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief". *Friendship Materials Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982). *See also Frisch's,* 759 F.2d at 1263; *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1984); and *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537 (6th Cir. 1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). "[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d at 1229. "That is, a strong showing of irreparable harm, decidedly outweighing harm to the defendant, may justify an injunction even where the movant cannot make a strong showing of likelihood of success on the merits ..." *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1427 (S.D.Ohio 1990) (Kinneary, J.) (citing *Frisch's,* 759 F.2d at 1263.[2] The Court will now turn its attention to the application of the four factors to the case *sub judice.* The first of the four factors is the "likelihood of success on the merits".

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

In order to address the issue of the movant's likelihood of success on the merits with regard to the underlying claims, the Court must first look to the Plaintiff's stated causes of action. It is based upon these claims that the Court must predict whether the movant's case is meritorious or frivolous, a possibility or impossibility; and in the end the Court must determine some probability, if any, of success on the merits.

---

**1.** Ostensibly, Northwest is correct in stating that Transamerica grew perturbed with Farb by virtue of the first clause of the agreement Harrison attempted to make with Transamerica when he flew out to Los Angeles to meet with them. According to Harrison's letter of May 7, 1991, the agreement provided as follows:

1. All future questions with Transamerica concerning commissions, monies due etc. will be handled through me [Harrison]. If Sam Farb contacts Transamerica in any way the General Agency and Agency contract for Northwest Financial is terminated.

Whether the reason Transamerica was perturbed due to Farb's letters to Carpenter is a factual question that is contention.

**2.** This Court does not apply the "sufficiently serious question going to the merits" standard to the instant case, instead finding that such a standard is limited to Lanham Act cases such as *Frisch's Restaurant, Inc. v. Shoney's Inc.,* and *Worthington Foods, Inc. See also Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642 (6th Cir.) (Lanham Act case), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982); and *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n,* 711 F.Supp. 1423 (S.D.Ohio 1989) (J. Graham) (Lanham Act case).

It has become clear to the Court, through the pleadings and upon hearing the arguments of respective counsel, that the plaintiff is alleging that the termination of Northwest's General Agent's Agreement and Agent's Agreement, by Transamerica was a wrongful termination. The two agreements provide for and permit termination "at-will", however, Northwest argues that termination in "bad faith" is actionable even under an at-will employment agreement, citing *Randolph v. New England Mutual Life Ins. Co.*, 526 F.2d 1383 (6th Cir.1975).

Paragraph fifteen of the General Agent's Agreement provides that "[t]his agreement may be terminated with or without cause by either the Company or the General Agent upon thirty days' written notice to the other party." Likewise, paragraph seventeen of the Agent's Agreement provides that "[t]his agreement may be terminated with or without cause by either the Company or the Agent upon five days' written notice to the other party." In both instances it is clear that the contracts create an at-will employment arrangement.

 Under Ohio law it has long been held that either party to an at-will agreement may terminate the employment relationship for any reason which is not contrary to law. *See, e.g., Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 102, 491 N.E.2d 1114 (1986); *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103, 483 N.E.2d 150 (1985); *Evely v. Carlon Co.*, 4 Ohio St.3d 163, 447 N.E.2d 1290 (1983); *Fawcett v. G.C. Murphy & Co.*, 46 Ohio St.2d 245, 348 N.E.2d 144 (1976); *Henkel v. Educ. Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976); and *LaFrance v. International Brotherhood*, 108 Ohio St. 61, 140 N.E. 899 (1923). The Ohio Courts have further provided that "[e]mployment contracts can be terminated at will for any cause, at any time whatsoever, even if done in gross or reckless disregard of any employee's rights." *Phung*, 23 Ohio St.3d at 102, 491 N.E.2d 1114 (quoting *Peterson v. Scott Constr. Co.*, 5 Ohio App.3d 203, 205, 451 N.E.2d 1236 (1982); and citing *Wolf v. First National Bank of*

*Toledo*, 20 Ohio Op.3d 262, 263 (C.P.1980); *Dadas v. Prescott, Ball & Turben*, 529 F.Supp. 203, 206 (N.D.Ohio 1981); *Parets v. Eaton Corp.*, 479 F.Supp. 512, 519 (E.D.Mich.1979) (construing Ohio law)). "A fundamental policy in favor of the employment-at-will doctrine is the principle that parties to a contractual relationship should have complete freedom to fashion whatever relationship they so desire." *Phung*, 23 Ohio St.3d at 102, 491 N.E.2d 1114. It is further clear that, as stated in *Phung*, "Ohio has not yet recognized any public policy exceptions to the employment-at-will doctrine." *Id.* at 102, 491 N.E.2d 1114.

The exception to the at-will doctrine that the plaintiff wishes for this Court to find is one sounding in "bad faith" termination. Northwest cites *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383 (6th Cir.1975) (construing Ohio law), for the proposition that Ohio law does not permit either party to terminate the relationship in "bad faith". In *Randolph* the Sixth Circuit was reviewing the district court's interpretation of Ohio's at-will doctrine in relation to an alleged "bad faith" termination. The standard of review by the Sixth Circuit of the district court's interpretation of Ohio law was stated as follows: "In the absence of 'reported [state] decision[s] on the precise issue involved,' this court, like other courts in the absence of 'controlling state precedent,' gives 'considerable weight' to the district judge's interpretation of state law." *Id.* at 1385 (citing *Filley v. Kickoff Publishing Co.*, 454 F.2d 1288, 1291 (6th Cir.1972).

With the above-referenced standard of review in mind, the Sixth Circuit noted that "[n]either party ha[d] cited an Ohio case directly in point, that is, implying or refusing to imply 'good faith' or 'cause' limitations on a facially unrestricted termination provision in a contract otherwise for definite duration." As such the Court concluded that "[i]t seems apparent that Ohio courts would require a resolution of the issue created by an allegation of bad faith (in the absence of an express provision permitting termination in bad faith), in an action concerning an agency contract with the principle and the agent owing each

other reciprocal duties of good faith." *Randolph,* 526 F.2d at 1387.

In the subsequent and more recent case of *Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763 (S.D.Ohio 1984) (Spiegel, J.), the Court recognized "a duty of good faith pursuant to the reciprocal duties of good faith contemplated in *Randolph v. New England Life Ins. Co.,* 526 F.2d 1383 (6th Cir.1975) (construing Ohio law)". Under the facts of the case before Judge Spiegel he stated that "[f]rom [the opinion in *Randolph* ] it follows that, if the [employee's] contract with [the insurance company] was an agency contract, then [the insurance company] could exercise the terminable at will clause without incurring legal liability only as long as that exercise was *not in bad faith." Prudential,* 586 F.Supp. at 767 (emphasis added). Again, this is a federal court attempting to interpret the laws of the State of Ohio.

In response to *Randolph,* and presumptively its progeny, Transamerica points out that the state courts have not been so liberal in their approach to finding exceptions to the at-will doctrine. Specifically, Transamerica brings to the Court's attention the case of *Midwestern Indemnity Co. v. Luft & Assoc. Ins. Agency, Inc.,* No. 87AP–541 (Franklin County App., Dec. 23, 1987), 1987 WL 31285 (LEXIS, States library, Ohio file). In *Midwestern Indemnity* the Court of Appeals of Ohio, Tenth Appellate District, provided as follows:

Lufts next contend that there was a genuine issue of material fact about whether Midwestern's termination of the agency agreement was done in bad faith, which they argue would provide a basis for avoiding the termination. There is some evidence of a bad faith determination, construing the evidence most favorably towards the nonmoving parties, as must be dome in summary judgment.

\* \* \* \* \* \*

The issue, however, is whether an alleged "wrongful" or "bad faith" termination has any relevance to termination of a contract which either party may terminate without any reason. *The case law in Ohio supports the proposition that, where termination of a contract may be done by either party for any reason whatsoever, there will be no inquiry into the motive for termination as it is irrelevant.* See generally *Cavanaugh v. Nationwide Mutual Ins. Co.* (1976), 65 Ohio App.2d 123, 128–130, [416 N.E.2d 1059].

*Id.* (emphasis added). Court of Appeals went on to address the *Randolph* case, and provided that "Appellants cite two federal decisions [3] purporting to declare Ohio law as requiring a resolution of the issue created by an allegation of bad faith termination. However, these cases appear to be contrary to reported Ohio law and *Randolph* has been criticized as inconsistent with controlling Ohio Law." *Id.* at 18 (citing *General Motors Corp. v. Mahoning Valley Sanitary Dist.,* No. 84AP–3638 at p. 8 (6th Cir.1985) [780 F.2d 1021 (table) ] ). Specifically, the Sixth Circuit criticized and narrowly construed *Randolph* by stating in *General Motors Corp. v. Mahoning Valley Sanitary Dist.* as follows:

The [*Randolph* ] court held that Ohio courts would not allow either party to terminate in bad faith. In so holding, the court relied on a line of cases holding that a principle may not terminate an agency agreement in bad faith as a device to escape the payment of a broker's commission. (citations omitted).

Whether the Ohio Supreme Court would adopt section 205 of the Restatement (Second) of Contracts is in our view uncertain at best. Further, we believe that federal courts run great risks in attempting to predict the future course of state law which is as yet undecided, especially when the effort may produce results counter to known existing state law. When this occurs, the result is too often to substitute personal predilection for the plain commands of *Erie Railroad v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938).

*Id.* at 6–7.

In reviewing the cases placed before the Court, it would appear that the holding in

---

3. The cases cited were *Randolph* and *Prudential Ins. Co. v. Eslick.* Since this Court has already addressed these cases the citations were purposefully omitted.

*Randolph* was at a time when the case law was less clear. However, since that time, several courts, both state and federal, have criticized, distinguished and narrowed *Randolph*. It is apparent to this Court that the State of Ohio has not embraced the plaintiff's request for an exception to the at will doctrine based upon bad faith termination. If any such similar exception were to exist it would be found under a scenario where the purpose of the bad faith termination was to unscrupulously defraud the employee of commissions or other monies due and owing. That is not the case in the matter before this Court.

In the instant matter, the plaintiff asks this Court to enjoin the defendant from terminating the General Agent's Agreement when the facts are abundantly clear that Farb terminated the agreement with his April 4, 1991, letter. Therefore, his potential for success on the merits of that aspect of his case appear to be somewhere between extremely remote and futile. Thus, the only other aspect of the injunction is to enjoin the termination of the Agent's Agreement. As previously stated, that agreement provided for at will employment, termination for bad faith does not appear to be a viable exception, and there seems to be some question as to whether termination of the General Agent's Agreement and termination of the Agent's Agreement go hand-in-hand. For these reasons, this Court finds that the likelihood of success on the merits concerns only the Agent's Agreement and hinges upon the upon the theory of bad faith termination; and upon that basis success is factually remote and legally almost nonexistent. As such, the plaintiff now bears a heavy burden to reflect irreparable injury in order for the motion to prevail.

## B. IRREPARABLE INJURY

Aside from the likelihood of success on the merits, Northwest must show this Court that it will suffer irreparable injury if the injunction requested is not granted. To this end the plaintiff argues that the termination of an on-going business is *per se* irreparable harm, citing the Second Circuit case of *Roso–Lino Beverage Distributor, Inc. v. Coca Cola Bottling Co. of New York, Inc.*, 749 F.2d 124 (2nd Cir.1984). In the *Roso–Lino* case the court found that the many years of effort and hard work, coupled with the extinguishment of the plaintiffs' livelihood constituted irreparable harm. Such a finding was based upon the Court's belief that any monetary award could not fully compensate the plaintiff and that it is unlikely that the continuation of the distributorship relationship would cause the defendant to suffer greatly.[4]

In that case, however, the plaintiff's were in a position to lose their business forever, while in the matter *sub judice* the plaintiff merely loses his ability to sell Transamerica products. As the testimony indicated at the hearing for the preliminary injunction, Farb is still permitted to "service" the clients he placed with Transamerica; albeit, it is more difficult due to his need to request information from Transamerica and request dispensation for other service related activities. Furthermore, it is clear that Farb still has approximately $2.3 million dollars worth of insurance premiums that he could place with any variety of other insurance companies. As such, the effect on Farb, while financially difficult, emotionally draining, and personally wearisome, it does not rise to the level of being irreparable. This Court is of the opinion that monetary terms could adequately compensate the plaintiff in the event he prevailed at trial.

## C. HARM TO OTHERS AND THE PUBLIC INTEREST

The third factor for this Court to consider is the harm that may come to persons

---

**4.** To the contrary, the Defendant cites the Third Circuit case of *GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (1988), wherein it was found that the termination of an agreement for the supply of parts is compensable by money damages. The defendant further cites the Eighth Circuit case of *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734 (1988), wherein it was found that there was no irreparable harm in the termination of a distributorship agreement. In *Modern Computer Systems, Inc.* the Court, in denying the injunction, specifically cited to other avenues of business which the plaintiff could call upon.

other than the plaintiff. If such harm outweighs the irreparable injury suffered by the plaintiff, then it is within the Court's discretion to deny the injunctive relief sought. "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff, the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985) (citations omitted).

In the instant matter, the harm to others, and specifically Transamerica, appears to be *de minimis*. While the continuation of an undesired relationship would be difficult for all parties concerned, this Court cannot conclude that the harm caused to Transamerica could reasonably be compared to the injuries suffered by Northwest through the termination of the relationship. However, the Court is not oblivious to the pragmatic difficulties inherent in forcing the continuation of an employment relationship. As cited by the defendant, "if the relationship of principal and agent is to be of value or profit to either, it must be accompanied by mutual confidence, loyalty and satisfaction." It would not be in the best interest of the parties or the public to continue a relationship that, by the very testimony of the plaintiff, is fraught with distrust, apathy, abhorrence, and continuing accusations of impropriety. Therefore, while the harm to Transamerica is not great, this factor does not go very far in the way of balancing the lack of irreparable harm and the minimal likelihood of success on the merits.

### D. THE PUBLIC INTEREST

The fourth factor to be considered by this Court is the public's interest in enjoining the actions of the defendant. Essentially, this is nothing more than the Court's valiant attempt to place societal interest in the overall equation when determining whether the injunction should be issued.

"If an injunction would bring disaster and ruin to the public, for instance, the Court may find that a preliminary injunction would be inappropriate, even if the movant were to show that the other factors weigh in its favor. By contrast, if an injunction would bring about a great public benefit by, for example, enjoining some seriously injurious activity, the public interest would weigh in favor of a preliminary injunction." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1463 (S.D.Ohio 1990) (Kinneary, J.). The seriousness of the matter before this Court hovers somewhere between the two extremes enumerated above. As such, the factor of public interest is of minimal consequence in determining whether the injunction should be issued.

### III. CONCLUSION

In reviewing the four factors, it is very clear to this Court that the issuance of a preliminary injunction is not appropriate. The likelihood of success on the merits is highly improbable and therefore the plaintiff is required to compensate for this deficiency by showing severe irreparable injury in the event an injunction is not granted; the plaintiff failed to do so. As such, Plaintiff Northwest Financial Agency, Inc.'s Motion for a Preliminary Injunction is hereby DENIED.

IT IS SO ORDERED.