**DAVIS & TATERA, INC., Plaintiff,**

v.

**GRAY–SYRACUSE, INC., Defendant.**

**No. C–2–90–295.**

United States District Court,
S.D. Ohio, E.D.

May 27, 1992.

James J. Marlin, Jr., Columbus, Ohio, for plaintiff.

John R. Gall, James D. Thomas, Pamela H. Thurston, Roger D. Branigan, Squire, Sanders & Dempsey, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the Defendant's motion for summary judgment. Fed.R.Civ.P. 56. This action, brought by a "manufacturers'. representative" against one of the manufacturers it represented for a period of approximately 8 years, includes claims for breach of contract, wrongful termination of an agency agreement, unjust enrichment, and quantum meruit.

## FACTS

The Plaintiff, Davis & Tatera, Inc. ("D & T"), is an Ohio manufacturers' representa-

tive firm that entered into an agency relationship with the Defendant, Gray–Syracuse, Inc., in early 1981 for the purpose of marketing the services of the Defendant in the state of Ohio. The Defendant is in the business of making metal castings, including primarily precision castings for use in the aerospace industry.

In early 1981, Bernard Davis, the President and part-owner of D & T, approached Gray–Syracuse about becoming a manufacturers' representative on an "exclusive territory" basis. Gray–Syracuse, through its Vice President of Sales Robert Prednis, initially informed D & T that it was not disposed to utilize manufacturers' representatives. Mr. Prednis also advised Mr. Davis that Gray–Syracuse was already supplying castings to the three largest potential users of precision castings in what would be D & T's natural sales area, and that no commission would therefore be available on sales to those accounts. Finally, Mr. Davis was also informed by Mr. Prednis that the technically complicated nature of precision casting made the long-term involvement of manufacturers' representatives largely unnecessary.

Eventually, however, Gray–Syracuse agreed to utilize D & T as its manufacturers' representative on a limited basis, although no written contract existed between the parties. Certain terms of the agreement are, however, undisputed. First, Gray–Syracuse reserved the right "to terminate [D & T] at some point in time in the future because we are not acclimated and we're not going to manufacturer's agents." Prednis Dep. at 13. D & T does not dispute that the agreement between the parties was not for a specific durational term. *See* Davis Dep. at 36 ("There was no term. You just, it just goes on until either party decides they want to say no …"). Furthermore, both parties concede that Gray–Syracuse initially agreed to pay a 5 percent commission on "commercial" parts and a 2-½ percent commission on "aircraft, high technology military" parts. Davis Dep.

Ex. 2. Later, upon the request of D & T, Gray–Syracuse agreed to pay a 5 percent commission on all parts,[1] and from the inception of the agency relationship in 1981 until the middle of 1989, Gray–Syracuse did indeed pay a 5 percent commission on all parts.

The relationship between the parties was apparently mutually beneficial and uneventful from its inception until February 16, 1989. On that date, Mr. Prednis forwarded a letter to Mr. Davis in which he informed him that Gray–Syracuse would no longer pay a 5 percent commission on existing aerospace accounts, but would instead revert back to the original 2½ percent rate. Davis Dep.Ex. 3. On February 27, Mr. Davis responded with a letter to John DeRosia, Product Sales Manager of Gray–Syracuse, in which he requested a meeting before Gray–Syracuse unilaterally lowered the commission rate. Again on March 13, Mr. Davis responded with a letter to Mr. Prednis in which he expressed his "dismay, disbelief and disappointment" in Gray–Syracuse's decision to revert to a 2½ percent commission, and requested that the reversion be postponed "until such time as a meeting is held in the Davis and Tatera, Inc. Offices and *mutual objectives are reached.*" Davis Dep.Ex. 5 (emphasis in original).

On May 11, 1989, the parties met to discuss the decision of Gray–Syracuse to decrease the commission rate. It is at this point that the parties cease to agree on the facts. Gray–Syracuse argues that D & T agreed to go back to a 2½ percent commission, and points to Mr. Davis' deposition testimony for support. On this topic, Mr. Davis testified as follows:

A: We never agreed to three-quarters of that contract. We agreed to some of the points, like the commission, we were talking about that, and we were talking in terms of longevity in case, primarily in case he died or John left

---

1. In his deposition, Mr. Davis stated that he understood that the increase in the commission rate was implemented by Gray–Syracuse because Mr. Prednis "felt a little bad" about the

fact that "for the first year or maybe two…. we couldn't make very much money." Davis Dep. at 30–31.

or they left and this new company took over. That was our discussion.

Q: In terms of the commission arrangement there was no disagreement, correct, the commission arrangement set forth in the letter of June 9th?

A: No, he was the one that gave it to us. He said he wanted to decrease it back down to two and a half percent, and in return we said, "What is in it for us?"

Davis Dep. at 64. D & T, on the other hand, argues that its agreement with respect to the commission rate was conditional upon reaching agreement with respect to issues of termination and duration of the relationship between the parties, and that no final agreement was ever reached. In fact, the record reveals that on August 7, 1989, Mr. Prednis faxed a proposed letter agreement to Mr. Davis, and Mr. Davis responded the next day by letter stating that the August 7 letter was "90% (ninety percent) complete. With a few additions.—A.Ok." Davis Dep.Ex. 9. Mr. Davis then proposed two changes to the proposed agreement, both of which dealt with an express termination procedure. Gray–Syracuse acquiesced in the first of the proposed changes, Davis Dep.Ex. 11, at ¶ 9, but declined consent to the latter. Davis Dep.Ex. 12. This latter provision proposed to add a "goodwill" clause calling for an additional payment to D & T in the event of termination in an amount representing six months of the prior year's average monthly commission.

Upon Gray–Syracuse's refusal to accept the "goodwill" provision, Mr. Davis again requested that Mr. Prednis meet with him in Columbus in order to work out their differences and finalize an agreement between the parties. However, on December 11, 1989, Mr. Prednis forwarded a letter to Mr. Davis purporting to terminate the agency agreement between the parties "effective December 1, 1989," although commissions were to be paid on all applicable shipments through December 31. Pl.Ex. 29. The Plaintiff then commenced this lawsuit on March 12, 1990.

## STANDARD OF REVIEW

Summary judgment is appropriate only in a limited number of circumstances. Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that summary judgment shall be granted only:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The Supreme Court has held that the standard of summary judgment "mirrors the standard for a directed verdict under Federal Rules of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This is true where, for instance, the dispute turns only on a legal question and the moving party must prevail as a matter of law even if the court were to resolve all factual disputes in favor of the non-moving party. *See Ross v. Franzen*, 777 F.2d 1216, 1222 (7th Cir.1985); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725, at 79 (2d ed. 1983).

In addition, a summary judgment motion requires special treatment of the record. The Court "must view the evidence presented through the prism of the substantive evidentiary burden" and determine "whether reasonable jurors could find by a preponderance of the evidence that the Plaintiff is entitled to a verdict ..." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, in making this determination the Court may not impinge upon the proper function of the jury. Therefore, all of "[t]he evidence of the non-movant

party is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## DISCUSSION

### I. BREACH OF CONTRACT

Once distilled, the Plaintiff's contract claim consists of three distinct claims:

1. a claim for the difference between the 2½ percent commissions Plaintiff received between July 1, 1989 and December 31, 1989 and the 5 percent commissions it claims it should have received;

2. a claim for commissions on parts that were ordered prior to December 31, 1989 but not shipped until after December 31, 1989; and

3. a claim for commissions on any part ordered after termination of the agency agreement by a customer whom D & T originally "procured" for the Defendant by inducing such customer to place a tooling order for a specific part with the Defendant.

The Court will consider each of these three contract claims.

### 1. THE DIFFERENCE BETWEEN THE 2½ PERCENT AND 5 PERCENT COMMISSION RATE

■ The Plaintiff's first contract claim requires this Court to determine whether the Defendant was entitled to unilaterally decrease the commission rate to 2½ percent, or in the alternative, whether the Plaintiff agreed to such a decrease.

It is undisputed that the original contract between the parties specified a commission of 5 percent to be paid on certain commercial parts and a commission of 2½ percent to be paid on other high technology parts. It is also undisputed that some time after the parties reached this agreement, Plaintiff approached the Defendant and requested a 5 percent commission on all parts. The Defendant agreed to the increase and for the next eight years paid a 5 percent commission on all parts.

The Defendant does not really contest the first issue, and the Court finds that there exists a question of fact as to whether the parties actually reached an agreement to increase the commission rate, and if so, whether that agreement was for a temporary term only. The Court notes, however, that the Defendant's argument that the alleged agreement was gratuitous and unsupported by consideration is inapposite to the question at hand. In Ohio, a "gratuitous oral agreement to modify a prior written agreement is binding if it is acted upon by the parties and if a refusal to enforce the modification would result in a fraud or injury to the promisee. Subsequent acts and agreements may modify the terms of a contract, and ... neither consideration nor a writing is necessary." *Software Clearing House, Inc. v. Intrak, Inc.,* 66 Ohio App.3d 163, 171, 583 N.E.2d 1056, 1061 (1990) (citations omitted).

The actual dispute on this issue is whether the Plaintiff agreed to a reduction in the commission rate to 2½ percent on high technology parts. While the Defendant correctly asserts that the Plaintiff agreed to the reduction, there exists a question of fact as to whether the Plaintiff's acceptance of the reduction was contingent upon the Defendant's acceptance of terms altering the at-will nature of the agreement between the parties. Mr. Davis' deposition does contain language suggesting that he accepted the decrease in the commission rate, but it also contains language suggesting that such acceptance was conditioned upon Gray–Syracuse's acceptance of additional termination terms. *See* Davis Dep. at 64. Furthermore, D & T's acceptance of commissions at the 2½ percent rate for a six-month period may imply its acceptance of the lower rate, but it may also merely evidence D & T's fear that the entire relationship between the parties might ultimately be terminated if it objected too loudly and its desire, therefore, to accept the lower commission on a temporary basis while the parties continued negotiating toward a "final" agreement. Thus, whether or not D & T agreed to the commission reduction is therefore a question for the trier of fact and precludes the entry of summary judgment on this point.

## 2. THE VESTING OF COMMISSIONS

■ The Plaintiff's second contract claim requires this Court to determine whether the Plaintiff's right to commissions vested at the time the Defendant received an order so that, even after termination of the relationship between the parties, the Plaintiff was still entitled to receive a commission for that order.

The Plaintiff asserts that its right to receive payments for a particular order vested at the time of "sale"—which it defines as "when defendant accepted a customer purchase order based on tooling that plaintiff was the procuring cause of." Pl's Mem.Contra at 8. The Defendant, on the other hand, claims that Plaintiff's right to receive payments vested at the time of shipment, and it points to the fact that it actually paid the Plaintiff its commission at the time of shipment.[2]

In Ohio, the payment of commissions to an agent is primarily dependent upon the contract between the agent and principal. *Cohen v. I.B. Goodman Mfg. Co.*, 85 Ohio App. 85, 87 N.E.2d 370 (1948). Thus, where no written agreement exists, the moment at which an agent's right to receive a commission vests must be determined from the oral agreement between the parties as evidence by the parties' understanding of the agreement, course of dealing, and other surrounding circumstances. Here, the evidence is conflicting. As one might expect, both parties now claim to have a different understanding of their "agreement." *Compare* Def's Mot. for Summ.J. at 20 ("the contract ... gave [D & T] a right to commissions only upon *shipment* of Gray–Syracuse products to customers Plaintiff had introduced") (emphasis in original) *with* Pl's Mem.Contra at 8 ("the evidence to date clearly shows that plaintiff's commissions vested upon a 'sale', that is when defendant accepted a customer purchase order based on tooling that plaintiff was the procuring cause of"). Furthermore, while both parties agree that payment did not occur until the time of shipment—and for the majority of the relationship until the time Defendant actually received payment from the customer—they dispute the rationale behind this custom and its meaning with respect to the current issue. As such, it is a question of fact for the jury. *See Benadum v. Cincinnati Floor Co.*, No. 85AP–176, 1986 WL 7489 (Franklin Cty. June 30, 1986) ("Defendant argued to the effect that, since a commission was paid only on net profits after the job was completed, necessarily, the right to a commission could not vest upon procurement of the job. However, as the trial court instructed the jury, this was a factual issue presented as to which the evidence upon which the defendant relies was pertinent but not controlling.").

## 3. POST–TERMINATION ORDERS

■ The Plaintiff's final contract claim requires the Court to determine whether the Plaintiff has the right to receive commissions for orders which were not yet received by the Defendant prior to the termination of the relationship between the parties. In effect, the Plaintiff seeks commissions on any orders for parts which it first induced the customer to purchase from the Defendant, even though it played no role in inducing the customer to place the specific order for which it now seeks a commission.

This question is perhaps the most difficult of the three and requires this Court to determine Ohio's application of the "procuring cause" doctrine. In 1957, the Supreme Court of Ohio enunciated the doctrine with respect to real estate brokers:

> It is the established rule that before a real estate broker is entitled to collect a commission for the sale of property he must show that he was the "procuring cause" of the sale. "The term 'procuring cause' as used in describing a broker's activity, refers to a cause *originating* a series of events which, without break in their continuity, result in accomplishment of the prime objective of employment of the broker—producing a purchaser

---

**2.** It appears, however, that the Defendant eventually began paying the Plaintiff at the time payment was received from the customer, not at the earlier time of shipment.

ready, willing and able to buy real estate on the owner's terms."

*Bauman v. Worley*, 166 Ohio St. 471, 473, 143 N.E.2d 820, 822 (1957) (citations omitted) (emphasis in original).

Here, there is no evidence whatsoever that the parties ever expressly agreed—let alone discussed—the issue of post-termination commission payments. Thus, the Plaintiff relies upon the "procuring cause" theory as the basis for its claimed entitlement to relief even in the absence of a contractual provision. In so doing, however, the Court believes that the Plaintiff misapprehends the "procuring cause" theory in several different respects.

First, the purpose of the "procuring cause" theory is to prevent an agent from being denied a commission on a sale for which the agent performed the majority of the work and brought the sale essentially to fruition. As such, it is linked to the acquisition of particular orders by the agent, not customers. *See, e.g., William Kehoe Assoc. v. Indiana Tube Corp.*, 891 F.2d 293 (table), (6th Cir.1989) ("[I]t is the acquisition of orders, not the acquisition of the customer that is protected by the "procuring cause" doctrine"); *Wood v. Hutchinson Coal Co.*, 176 F.2d 682, 684 (4th Cir.1949) ("For obtaining the customer and making the first sale [the agent] was entitled to and was paid the agreed commissions, but that situation did not continue indefinitely. It is well-established that the successful negotiation of a contract by an agent does not give him a right to commissions on renewal, which he does not secure, in the absence of an express contract to that effect."). While the Ohio Supreme Court has not ruled on the exact issue, this Court has no reason to believe that it would reach a different conclusion. Indeed, any other result would work a hardship on principals in that they would face potential liability *ad infinitum* in situations such as that presented here. Thus, the Plaintiff's claim that it is entitled to receive commissions on a "customer" or "part" basis is neither supported by contract nor the "procuring cause" doctrine.

Alternatively, the "procuring cause" doctrine is itself limited by the language of the contract between the parties and does not itself create an entitlement that would not otherwise exist. In other words, the doctrine gives to an agent the right to receive a commission where the agent has done substantially that which was required of him under the terms of his contract. Thus, the doctrine works in conjunction with, and not in place of, the agreement between the parties. *See, e.g., Kingsley Assoc., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1282 (6th Cir.1990) ("Application of the 'procuring cause' doctrine depends on a determination of the intentions of the parties to the agency relation.").

According to the agreement between the parties, the Plaintiff's right to a commission vested at the time of "sale."[3] In fact, throughout its memorandum in opposition to the current motion, the Plaintiff affirmatively argues that its right to a commission vested upon a "sale." *See, e.g.*, Pl's Memo.Contra at 8 ("the evidence to date clearly shows that plaintiff's commissions vested upon a "sale", that is when defendant accepted a customer purchase order based on tooling that plaintiff was the procuring cause of"). Because the right to a commission vests upon the closing of a specific "sale" and not the attainment of a "customer," the Court finds that the agreement between the parties does not provide for the payment of commissions for orders placed after termination, since while Plaintiff may have been the initial procuring cause of the customer, it was not the procuring cause of any post-termination sale. *See Roberts Assoc., Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650, 653–54 (E.D.Mich. 1990) ("It is clear that plaintiff has no valid claim to commissions ... after the date of its termination.... [T]he agency agreement [did not] guarantee commissions for all sales to *customers* procured by plaintiff. Rather, the agreement merely promised commissions for *sales* ...").

Finally, even if the "procuring cause" doctrine did apply to this situation, the Defendant would still be entitled to sum-

---

**3.** Both parties agree on this point, although they disagree as to when a "sale" occurred.

mary judgment. It is conceded that the Plaintiff had nothing to do with any sales of the Defendant's parts after its December 31, 1989 termination.[4] As a matter of law, then, "it could not have been the procuring cause of those sales." *Roberts Assoc.*, 741 F.Supp. at 654. *See also Ohio Marble Co. v. Byrd*, 65 F.2d 98, 101 (6th Cir.1933) ("The renewal was in no sense due to the activities of appellee. It came about naturally because of the satisfactory service appellant had rendered to its old customer ...").

## II. UNJUST ENRICHMENT AND QUANTUM MERUIT

■ The second and third claims of Plaintiff's Complaint seek recovery not on the contract between the parties, but on the extra-contractual theories of unjust enrichment and quantum meruit. The only issue presented to the Court is whether such extra-contractual remedies fail as a matter of law where a contract governs the relationship between the parties.

Notwithstanding Plaintiff's citation to Illinois law, it is well-established in Ohio that where a contract exists, the parties to the contract may not seek damages under quasi-contractual theories of recovery. In *Ryan v. Rival Mfg. Co.*, No. C–810032, 1981 WL 10160, at *1 (Hamilton Cty. Dec. 16, 1981), the Ohio Court of Appeals explained:

It is clearly the law in Ohio that an equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract or a contract implied in fact. The mere fact that issues exist as to the creation of the contract or the construction of its terms does not alter this rule.

In the instant cause the appellants' breach of contract action is premised on

their claim that the appellee terminated them as sales representative and has not paid all the commissions due them under their agreement. The essence of the appellants' unjust enrichment claim is that the appellee has been unjustly enriched by the retention of those unpaid commissions. The subject matter of these two claims is the commissions that the appellants contend are due them under the sales representative contract. Clearly the subject is the same for both. The mere fact that the lower court did not grant the appellee's motion for summary judgment as to the appellants' breach of contract claim (thus implicitly ruling that genuine issues of material fact do exist regarding this claim) does not prevent the above delineated rule of law from applying.

*See also Wall v. Thompson*, No. CA 2777, 1991 WL 216401, at *5 (Ohio Ct.App. Oct. 18, 1991) ("Quantum meruit is a rule of damages based in equity which permits an injured party to recover damages in order to prevent another party from being unjustly enriched. An action in quantum meruit lies when no contract exists upon which damages may be awarded."); 18 O.Jur.3d, Contracts § 342 (1980) ("Where there is an express promise, a promise will not ordinarily be implied in law. The rule that an implied obligation arises to pay the reasonable value of work done by an individual for the benefit of another ordinarily has no application where there is a valid and enforceable express contract between the parties.").

In response, the Plaintiff argues that Rule 8(e)(2) of the Federal Rules of Civil Procedure allows a party to set forth alternate or hypothetical claims. While this is undeniably true, such a rule does not stand for the proposition which the Plaintiff claims. The procedural rules of the federal courts are merely that: procedural rules.

---

4. This conclusion is strengthened by the fact that the customers of Gray–Syracuse own the tooling for each part manufactured by Gray–Syracuse. *See* Aff. of John DeRosia, ¶ 4. Thus, notwithstanding Plaintiff's arguments to the contrary, a customer is capable at any time of placing its business with another manufacturer. While D & T may be fully responsible for the

initial contact between Gray–Syracuse and some of its customers, it cannot be said that D & T is the "cause" of any order placed after the termination of its representation agreement. Rather, the procuring cause of any such order can only be that particular customer's continuing satisfaction with the quality of the Defendant's work and/or the services it provides.

They do not confer substantive rights on the parties that do not exist in state law. Rule 8(e)(2) merely allows a plaintiff—in the initial pleadings—to allege claims that cannot possibly co-exist as a factual matter.

Thus, the procedural rule cited by the Plaintiff does not prevent this Court from granting judgment in favor of the Defendant on the unjust enrichment and quantum meruit claims.[5] In Ohio, such quasi-contract claims cannot be brought where the subject matter of the claims is governed by a contract between the parties. Here, there is an agreement between the parties governing the payment of commissions that existed for at least eight years, and the only contractual issue is whether the parties agreed to modify the terms of that contract in 1989. Thus, as a matter of law, the Plaintiff's claims are governed by the contract and it cannot prevail on its claims of unjust enrichment and quantum meruit.

### III. WRONGFUL TERMINATION OF THE AGENCY AGREEMENT

■ Both parties agree that an agency relationship existed between the parties, although a dispute exists as to whether, despite the apparent "at-will" nature of the agreement, the Defendant was obligated to exercise good faith and provide reasonable notice before terminating the agreement. Resolution of this issue requires the Court to resolve the tension that exists in Ohio case law between the reciprocal good faith obligations imposed upon parties to an agency agreement, on the one hand, and the continuing viability of the "terminable at will" concept associated with "at-will" contracts, on the other.

The Plaintiff takes the position that because an agency relationship existed between the parties, and because such relationships are characterized as fiduciary in nature, the Defendant was obligated to exercise good faith and provide reasonable notice before terminating the agreement between the parties. The Defendant, on the other hand, takes the position that the agreement between the parties contained no durational term and that both parties understood that the agreement could be terminated at any time by either party.

Resolution of this dispute requires this Court to reconcile well-settled aspects of Ohio employment law with equally well-settled aspects of Ohio agency law. On the one hand, agency agreements without a definite period of time are deemed to be terminable at will. 3 Ohio Jur.3d, Agency and Independent Contractors § 22. Here, the agreement between the parties not only contained no durational term, but it appears that both parties understood the agreement to be terminable at any time.

On the other hand, the agency relationship is a fiduciary one, and as such, the parties to an agency agreement owe each other the obligation to act in good faith. *Id.* at § 102 ("The relation between principal and agent being a fiduciary one, the law requires of the agent an unqualified exercise of fidelity and good faith in the execution of the agency.... The rule of good faith is not confined to the agent; entire good faith is required of both parties—of both principal and agent—in the execution of the agency contract.") (footnotes omitted); 3 Am.Jur.2d, Agency § 246 ("Throughout the entire relationship, a principal has the obligation toward his agent of exercising good faith in the incidents of their relationship").

Thus, the question for this Court to decide can be stated as follows: Where the parties to an agency agreement concur that their relationship may be terminated at any time by either party, does the law still impose upon the parties a duty to only terminate the agreement in good faith and with reasonable notice? The Court an-

---

**5.** Where there is a breach of contract, the non-breaching party may elect to rescind the contract and sue for the value of services rendered. 18 Ohio Jur.3d, Contracts § 353. Here, however, the Plaintiff did not rescind the contract and has never suggested in this lawsuit that it wishes to do so and has never suggested that its claims are not governed by the express oral contract between the parties.

swers this question in the affirmative.[6]

In *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383 (6th Cir.1975), the Sixth Circuit held that termination of an agency relationship pursuant to a facially unrestricted termination clause was subject to a duty of good faith. *Id.* at 1386. In reaching its conclusion, the court noted that "an Ohio appeals court has recognized ... 'that, where a principal has the right to terminate the authority of an agent at any time, such principal may not do so in bad faith as a device to escape the payment of a broker's commission.'" *Id.* at 1387 (citations omitted). The court's conclusion recognizes the basic principle that, in the context of agency relations, duties of good faith between a principal and his agent are reciprocal. *Id.* at 1387. *See also Prudential Ins. Co. v. Eslick*, 586 F.Supp. 763 (S.D.Ohio 1984) (court recognized a "duty of good faith pursuant to the reciprocal duties of good faith contemplated in *Randolph v. New England Life Ins. Co.*"); *Smith v. Frank R. Schoner, Inc.*, 94 Ohio App. 308, 311–12, 115 N.E.2d 25, 27 (1953).

Since *Randolph*, which is binding on this Court, no published decision has appeared in Ohio addressing this issue. Several unpublished decisions have appeared which have reached the opposite conclusion. In *Balfance v. Standard Oil*, No. 14688, 1990 WL 203173 (Ohio Ct.App. Dec. 12, 1990), *Forcina v. State Auto Ins. Co.*, No. 55731, 1989 WL 112406 (Ohio Ct.App. Sept. 21, 1989), and *Midwestern Indem. Co. v. Luft & Assocs. Ins. Agency*, No. 87AP–541, 1987 WL 31285 (Ohio Ct.App. Dec. 23, 1987), it was held that—based upon the employment-at-will-doctrine—a principal owes no duty of good faith in the termination of an agency relationship. Indeed, it was upon this analogy to employment law that a recent district court held, too, that good faith

was not a prerequisite to termination of an agency agreement. In *Northwest Financial Agency, Inc. v. Transamerica Occidental Life Ins. Co.*, 773 F.Supp. 75, 81 (S.D.Ohio 1991), the court stated that since *Randolph*, "several courts, both state and federal, have criticized, distinguished and narrowed *Randolph*. It is apparent that Ohio has not embraced ... an exception to the at will doctrine based upon bad faith." The Court stated further that it was not convinced that Ohio would adopt Restatement (Second) of Contracts section 205, which imposes a duty of good faith in the performance of all contracts. *Id.* at 80.

The flaw with the decisions which appear to take a position contrary to that taken by the Sixth Circuit in *Randolph* is that they fail to distinguish between basic notions of agency law and at-will employment. Good faith is at the core of all agency relationships, and can in no way be diluted by reference to principles of at-will employment. Indeed, to adopt the rule advanced by the Defendant in this case would eviscerate the very foundation upon which agency law is built: Good faith. This the Court declines to do.

Even were this Court to follow *Northwest Financial*, the result would be no different. In *Northwest Financial*, the court recognized a bad faith exception for cases in which it was found that the purpose of the termination was to "defraud the employee of commissions or other monies due and owing." 773 F.Supp. at 81. In substance—if not also in form—this language tracks the language of *Randolph's* good faith requirement: "such principal may not [terminate] in bad faith *as a device to escape the payment of a broker's commission*." 526 F.2d at 1387 (emphasis added). Thus, whether viewed as a good faith requirement or merely as an excep-

---

**6.** In answering this question in the affirmative, the Court does not suggest that one party to an agency agreement may not explicitly waive the other party's obligation of good faith. The Court does hold, however, that where the parties merely agree that either party may simply walk away from the relationship at any time, it cannot be said as a matter of law that the parties have waived the duty of good faith. Rather, it is equally likely that the parties were

merely attempting to resolve the issue of *when* the relationship could be terminated and were not in any manner attempting to resolve the issue of under what circumstances it could be terminated. As such, it is a question of fact for the jury to decide whether the Plaintiff waived the Defendant's obligation of good faith and, if it did not, whether the Defendant terminated the relationship in bad faith.

tion to the rule that no good faith requirement exists, the result is the same: a principal may·not terminate an agency relationship merely to escape the payment of the agent's commission. Here, a question of fact exists whether the Defendant terminated the relationship between the parties merely to avoid paying commissions which had become—or were about to become—vested in D & T.[7]

## IV. TREBLE DAMAGES PURSUANT TO OHIO REVISED CODE § 1335.11

The Defendant advances several arguments in support of its position that the Plaintiff may not recover treble damages pursuant to Ohio Rev.Code § 1335.11. First, it argues that without direction from the Ohio legislature, the statute can only operate prospectively and that to apply it here would be a retroactive application. Second, it argues that even if the legislature intended for the statute to operate retroactively, to do so here would be an unconstitutional impairment of the contract between the parties and a violation of the Ohio Constitution's prohibition against retroactive laws. Finally, it argues that the statute does not apply since the statute's own language limits its reach to "products for resale."

■ With respect to the retroactivity issue, there is no dispute between the parties regarding the applicable law. Both agree that statutes are presumed to operate prospectively, unless the legislature expresses a contrary intent. *See* Ohio Rev.Code § 1.48 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."). As is often the case, Ohio Rev.Code § 1335.11 is silent on the issue. Because the legislature has nei-

ther expressly nor impliedly indicated an intent that the statute operate retroactively, the statute can only operate prospectively.

This does not resolve the issue, however, because the parties disagree as to whether the application of § 1335.11 to the current dispute involves a retroactive or prospective operation of the statute. The Defendant claims that since the contract between the parties was consummated in 1981, application of § 1335.11—which was enacted in 1988—would be retroactive. On the other hand, the Plaintiff claims that since the trigger of the treble damage provision is the Defendant's alleged failure to pay commissions, and since this failure on the part of the Defendant did not occur until 1989, application of § 1335.11 to the current action would be prospective only.

The Plaintiff's position is without merit. It is established law in Ohio that the application of a statute which imposes an additional liability upon a contract to a contract executed prior to enactment of such statute involves a retroactive operation of the statute, regardless of the timing of the event that "triggers" liability. *See, e.g., Excello Wine Co. v. Monsieur Henri Wines, Ltd.,* 474 F.Supp. 203 (S.D.Ohio.1979) (Kinneary, J.) (holding that an Ohio statute imposing a "just cause" for termination requirement in all alcoholic distributor relationships would operate retrospectively if applied to a distributor relationship that pre-dated enactment of the statute, although the termination occurred after enactment); *Kiser v. Coleman,* 28 Ohio St.3d 259, 503 N.E.2d 753 (1986) (holding that the application of an Ohio statute to land installment contracts consummated prior to enactment would be an unconstitutional retroactive

---

7. The Court wishes to advise the parties that its holding on the wrongful termination claim may not be used as a means to circumvent the Court's holding with respect to the "procuring cause" doctrine. In other words, termination as a "bad faith effort to escape the payment of commissions" implies that the commissions must be vested, or in the alternative, the commissions must be almost vested, *i.e.,* to the point that the Plaintiff can truly be deemed the "procuring cause" of the disputed orders. In no manner, however, can it be deemed bad faith

for the Defendant to have terminated the relationship between the parties in an effort to cut off commissions for orders which had not yet been placed and for which the Plaintiff had expended no effort. As a matter of law, the Plaintiff is not entitled to commissions on such future orders as it cannot be said that the decision of Gray–Syracuse to terminate the relationship in an effort to escape payment of those commissions is anything but sound business judgment.

application of the statute). Thus, because application of § 1335.11 to the current action would be a retroactive application of the statute, and because there is no indication that the Ohio legislature intended such a result, the statute does not apply to the agreement between the parties and the Defendant's motion for summary judgment on the treble damage issue must be granted.[8]

WHEREUPON, upon consideration and being duly advised, the Court finds Defendant's motion for summary judgment to be partially meritorious, and it is, therefore, GRANTED IN PART AND DENIED IN PART. This action is set for trial on Monday, July 13, 1992, at 9:00 a.m. The parties shall also attend a final pretrial conference in this Court's chambers on Friday, June 19, 1992, at 11:00 a.m. Finally, the parties are directed to file any motions in limine by Monday, June 29, 1992, and any proposed jury instructions by Monday, July 6, 1992.

IT IS SO ORDERED.

---

**8.** The Court's resolution of this issue obviates the need to consider either the constitutional or the resale-wholesale issue.