NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0085n.06
Filed: February 1, 2007

No. 06-1279

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| URBAN ASSOCIATES, INCORPORATED, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| STANDEX ELECTRONICS, INCORPORATED, | ) | COURT FOR THE EASTERN |
| and STANDEX INTERNATIONAL | ) | DISTRICT OF MICHIGAN |
| CORPORATION, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BATCHELDER and GRIFFIN, Circuit Judges; and PHILLIPS, District Judge.[*]

GRIFFIN, Circuit Judge.

In 1990, the predecessor to plaintiff Urban Associates, Inc. ("Urban") entered into a sales

representative agreement ("agreement") with defendant Standex Electronics, Inc., a wholly-owned

subsidiary of Standex International Corporation (collectively "Standex"). The agreement called for

Urban to solicit requests for quotation ("RFQs") from potential customers in the automotive industry

– primarily in Michigan – for Standex's custom-manufactured parts. In return, Standex agreed to

_____

[*]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

pay Urban commissions for certain sales generated pursuant to an RFQ obtained by Urban. After Urban performed under the agreement for about twelve years, Standex exercised its contractual right to terminate the agreement on sixty days' written notice. At about the same time, Standex hired the Urban employee who had been soliciting customers under the agreement ("the sales representative"); that enabled Standex to have its own employee act as salesman, rather than paying commissions.

Urban sued in the United States District Court for the Eastern District of Michigan, claiming that Standex breached the agreement by failing to pay commissions due on products that were shipped after the termination date pursuant to purchase orders that were booked *before* the termination date (count one). Urban also claimed that Standex terminated the agreement in a bad-faith effort to avoid paying commissions due (also count one). In the alternative, Urban argued that if it were found not entitled to commissions on the disputed shipments under the agreement, it was entitled to compensation in *quantum meruit* to avoid the unjust enrichment of Standex (count two). Urban further claimed that Standex tortiously interfered with its employment relationship with the sales representative by inducing her to leave Urban (count three), and it sought declaratory relief as to Standex's continuing obligations under counts two and three (count four).

The district court granted summary judgment for Standex on all counts. For the reasons that follow, we affirm in part and reverse in part. Specifically, we affirm summary judgment for Standex on the bad-faith termination claim (count one, part two), the *quantum meruit* claim (count two), the tortious-interference claim (count three), and the request for declaratory relief as to *quantum meruit* and tortious interference (count four). We reverse summary judgment, however, with regard to the breach-of-contract claim (count one, part one).

I.

The district court had uncontested diversity jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), and we have uncontested appellate jurisdiction under 28 U.S.C. § 1291.

II.

Urban was an independent sales representative enterprise that sold electronic components, primarily to the auto industry, on behalf of manufacturers. Standex is a manufacturer of electronic components and assemblies for use in the auto, communication, and medical industries.

Standex manufactures "engineered" parts, i.e., custom parts, which the parties agree require a great deal of effort before the final product reaches the consumer. First, the customer sends the specifications of its desired part to Standex with a request for a price quote. Second, Standex designs and engineers the part in order to ascertain how much to quote as its production price. If the customer accepts Standex's bid, Standex begins making the tooling equipment (molds and presses) needed to make the part; this process can entail the creation of prototypes and some pre-production approval steps. Once Standex finishes the design and sets up the equipment to manufacture the part, it waits for the customer's instructions as to how many parts to produce and when to deliver them. The time between development of a customer's RFQ and Standex's shipment of the custom parts can range from six months to a year.

When a customer decides that it is going to buy parts from Standex, the customer issues documentation indicating that Standex was awarded business for a given part, identified by part number, purchase order ("PO"), and percentage of the buyer's business in that part. The customer might issue a purchase order for a specified period of time, a reorder of the same part, or a blanket

Case No. 06-1279
*Urban Assocs., Inc. v. Standex Electronics, Inc. & Standex Int'l Corp.*

PO (discussed below). Once the customer issues an order, Standex puts it into an "open order" file and issues an Order Acknowledgment that lists the PO date, purchase price, the customer's part number, and Standex's internal part number. As Standex Vice-President ("VP") Charles Johnson testified at deposition, "[T]here was always a constant record on the computer that we received this purchase order, it has been acknowledged and the sales [credit] go to this sales representative and the deliveries are such and such."

The assigned part number remained the same as long as there was no change to the part; any revisions would be denoted by adding an alphabetical suffix to the part number. Johnson testified that Standex's objective was to obtain the customer's business for the life of the part or the life of the program.

A blanket PO specifies the customer's possible quantity requirements, the prices for various quantities of the part, and other terms. A blanket order did not obligate the customer to buy any parts, and it did not obligate Standex to make or ship any parts; those obligations did not arise until the customer issued a shipment order (also known as a production or release order) "against" the blanket PO. Blanket POs could last for a period of time – Standex customers' blanket PO's typically lasted up to a year – whereas a shipment order was a discrete order to be filled under the terms spelled out in the blanket PO. If a blanket PO expired and the customer still wished to buy more of the same part, the customer would issue another blanket PO and issue shipment orders against it as needed.

Before 2003, Standex used sales representatives to make initial contact and solicit RFQs from potential customers. While the representative was developing the RFQ with the customer, he bore

his own expenses; he was not entitled to commissions until the product shipped. Thus, a representative's commissions depended on the quantity of the product actually shipped.

In 1990, Urban's predecessor entered into an agreement to serve as Standex's sales representative, and, in 1992, Urban acquired the predecessor's assets and assumed its role under the agreement. The agreement, which was drafted by Johnson, contained only seventeen paragraphs. It provided, in part:

> 1. APPOINTMENT and ACCEPTANCE. The Company hereby appoints Representative as its sales representative to solicit orders for the sale of the products of the Company which are specified in Addendum "A" hereto . . . from customers located in the territory designated in Addendum "B" hereto . . . Representative hereby accepts such appointment and agrees to use its best efforts to aggressively solicit such orders from customers in the territory and to otherwise represent the interests of the Company in the Territory, in accordance with the terms and provisions of this Agreement.
>
> 2. TERM. This Agreement shall be effective as of the date specified above and shall continue in effect on an indefinite basis until terminated as provided in Section 10.
>
> 3. AUTHORITY. The Representative shall be the agent of the Company for the sole purpose of soliciting and receiving orders for the Products . . . .
>
> \* \* \*
>
> 7. COMMISSIONS. Subject to the provisions of Section 8, a commission of 5% shall be paid by the Company to the Representative, as his sole compensation hereunder, on the net sales value (invoice value less cash discounts, taxes, freight charges, transportation insurance, cancellations, returns, allowances and similar items) of shipments of Products made by the Company into the Territory as long as this agreement is in effect. . . .
>
> 8. SPLIT COMMISSIONS. In the event that a particular order involves more than one territory . . . the Company shall make a fair and equitable division of the commission applicable to that order . . . .

9.　　EXPENSES.　The Representative shall pay all expenses and bear all liability and obligations incurred in the operation of its business. . . .

10.　　TERMINATION.　*This Agreement may be terminated, with or without cause, by either party.*

If terminated by the Company, at least 60 days' prior written notice by certified or registered mail shall be given to the Representative.　Such notice may be given at any time during any month or year and the termination date shall be 60 days from the date the notice is received by the Representative.

*Upon termination by the Company, commissions shall be paid on all orders booked by the Representative and received by the Company in house prior to and including the termination date.*　No commissions shall be paid to the Representative for orders booked by the Representative and/or received by the Company after the termination date. . . .

\* \* \*

15.　　STATUS.　The Representative shall be an independent contractor and not an employee or partner of the Company.

(Emphasis added).　The agreement also contained an integration clause, ¶ 13, and the parties do not rely on any purported written or oral undertaking other than this agreement.[1]　Urban and Standex executed written amendments to the agreement, but they did not alter the material terms quoted above, other than providing different commission rates for different products.

Pursuant to the agreement, Urban solicited orders for Standex's RF inductor coils, reed switches, reed relays, proximity sensors, toroids, and transformers from customers throughout the entire state of Michigan, except for Ford ETC and Ford EFHD, plus specified locations in Illinois

---

[1]*See B.B. Banucks, Inc. v. City of Midland*, No. 215176, 2000 WL 33407204, \*2 (Mich. Ct. App. Sept. 5, 2000) ("When a contract contains an integration clause it is conclusive; parol evidence is not admissible to show that the agreement is not integrated unless fraud is alleged or where an agreement is incomplete on its face and requires parol evidence to fill in the missing terms.") (citing *UAW-GM H.R. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. Ct. App. 1998)).

and Indiana. Urban alleges that Standex's "business steadily increased after Urban became associated with Standex." Standex amended the agreement to add customers, and Standex named Urban its Salesman of the Year for 2000.

Sometime before June 30, 2001, Standex's Product Sales Manager Paul Linsley told Johnson that he wanted to hire Denise Falzone, the Urban employee then assigned as Standex's sales representative, directly, which would enable Standex to terminate its agreement with Urban and obviate the need to pay commissions. In July 2002, Standex general manager ("GM") James Anderson decided to terminate the agreement with Urban because he wished to eliminate sales representatives and use Standex employees as salesmen instead.

No later than early October 2002, Linsley called Falzone and told her that Anderson would be contacting her about "coming on board with Standex" and about Standex using direct salespeople. Within a week, Anderson contacted Falzone and told her that Standex was going to terminate Urban and go to direct sales, and that it was interested in hiring her. Later in October 2002, Anderson sent Falzone the Standex benefits binder, negotiations took place, and Falzone accepted a written offer of employment.

Standex sent a written notice of intent to terminate the agreement to Urban on November 15, 2002, with an effective date of January 14, 2003. Urban alleges that "the reason for waiting at least 4 months to terminate Urban [from GM Anderson's July 2002 decision to terminate, to Standex's November 15, 2002 letter actually terminating the agreement] was to allow Standex time to secure for itself the direct employment of Falzon [sic, Falzone] . . . ."

In mid-November 2002, just before Urban received the termination notice, Falzone notified Urban that she planned to quit on the last working day of that month. Falzone, who had worked for Urban for at least eight years (since 1993 or 1994), testified that she had a good relationship with Urban and had not been seeking other employment. Falzone immediately began working for Standex, serving essentially the same customers, for essentially the same products, as she had done as an Urban employee.

Standex paid commissions to Urban for orders shipped prior to the termination date, but it has not paid commissions for orders that were shipped after that date, even if Urban *before that date* had obtained ("booked") the purchase order against which the order was shipped.

III.

Urban filed a four-count complaint in district court in February 2004, asserting only state common-law claims, and Standex filed an answer in March 2004. In count one, Urban alleged that Standex breached the agreement in bad faith in order to avoid paying commissions on sales to customers assigned to Urban, "including customers located in Michigan, on business Plaintiff had already secured and/or on business Plaintiff had been previously working on that was likely to materialize and which did or will materialize." In count two, Urban contended that if the agreement did not expressly entitle Urban to the commissions sought, the court should order recovery under the doctrines of implied contract, *quantum meruit* / unjust enrichment, and/or "procuring cause." Urban seeks an amount equal to the 5% general contractual commission rate "on all business developed pursuant to the relationship between Plaintiff and Defendants for as long as Defendants benefit from such business . . . ."

Count three sounds in tort but still relates to the sales representative agreement and relationship. Urban alleges that Standex knew about Falzone's employment relationship with Urban and the corresponding duties that she owed to Urban and wrongfully interfered with their relationship. Urban further alleges that Standex illegally induced Falzone to breach her duties to, and terminate her employment with, Urban, causing Urban to lose business, business opportunities, and goodwill. Finally, count four is denominated as a claim for declaratory relief, but it actually lists all the remedies sought by Urban, including compensatory damages, punitive ("exemplary") damages of three times actual damages, an accounting of commissions owed and not paid, and the creation of a constructive trust and escrow account for the payment of commissions accruing in the future.

Standex moved for summary judgment, Urban filed an opposition brief, and Standex filed a reply brief. Without oral argument, the district court granted summary judgment to Standex in January 2006. Urban timely filed a motion for reconsideration, which the district court denied in February 2006 without waiting for opposition and reply briefs. Urban appealed two days later.[2]

IV.

We review the district court's entry of summary judgment de novo. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005) (citation omitted). A district court's interpretation of state law is likewise governed by the de novo standard. *Id.* Denial of a Rule 59(e) motion for reconsideration is generally reviewed only for abuse of discretion. *Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 637 (6th Cir. 2004) (citation omitted). When a party seeks

---

[2]Like the district court, we apply Michigan law to the tortious-interference claim and Ohio law to all other claims. The parties have not objected to this choice of law.

reconsideration of a grant of summary judgment, however, we conduct de novo review using the same standard employed by the district court. *Id.*

Summary judgment is proper where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 515 (6th Cir. 2006) (citing FED. R. CIV. P. 56(c)). In considering a motion for summary judgment, we construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences therefrom in its favor. *Moross*, 466 F.3d at 515 (citation omitted). The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## V.

## A.

The district court ruled as follows on the breach-of-contract claim:

> Here, the term "orders booked" is not susceptible to two or more reasonable interpretations. It is unreasonable to assume that Plaintiff would be due commissions on "orders" that would not create an enforceable obligation on the part of the customer to purchase the products ordered. *See Hudson v. Tektronix, Inc.*, 1982 Ohio App. LEXIS 12909 (Ohio Ct. App. 1982) (unpublished); *Chicago Fineblanking Corp. v. D.J. Cotter & Co.*, 1996 U.S. Dist. LEXIS 21882 (E.D. Mich. 1996) (unpublished). Plaintiff seems to argue that the Agreement vests commissions through a blanket purchase order, which commissions later become due when a shipment order is made by the customer. This interpretation, however, is not supported [by] the Agreement. The Agreement only provides for the payment of commissions "on the net sales value . . . of shipments of Products made by the Company into the Territory *as long as this agreement is in effect.*" Mot., Ex. C ¶ 7 (emphasis added). The agreement does not provide for commission on a "life of the part" basis because commissions are not paid on shipments made after termination

of the Agreement. Neither is the interpretation supported by extrinsic evidence. [citations to filings omitted]

Defendants owed commissions to Plaintiff for the "orders booked" that resulted in the obligation on the part of the customer to purchase the product so ordered. That obligation arose through the a [sic] customer's shipment or release order, which, when combined with the terms of the blanket purchase order against which it was made, would determine the obligations of the contracting parties and the commissions due Plaintiff. Defendants have paid Plaintiff all the commissions due in this manner and are therefore entitled to summary judgment on this claim.

Op. at 7-8.

We note quickly some shortcomings in the district court's analysis before delving into the interpretation of "orders booked" in greater depth. First, the district court asserts that Urban's "life-of-the-part" interpretation is not supported by any extrinsic evidence, but, as discussed below, Urban introduced expert testimony that, in its experience, life-of-the-part commissions are the industry norm after termination, absent contractual provision or post-termination negotiation to the contrary.

Second, the district court relies on the reference in ¶ 7 (the agreement's general commission provision) to commissions payable on products that are actually shipped, yet it does not mention the fact that ¶ 10 (the only provision that specifically addresses *post-termination* commissions) contains no such limitation. Third, the district court refers to a "shipment [order] or release order," despite the fact that the agreement never uses those terms.

Fourth, the district court supposes that Urban's right to commissions was predicated on the issuance of an order that obligated the customer to buy a certain quantity of a Standex product. But the agreement contains no such requirement as to post-termination commissions, and there is no record evidence that that was the nature of the blanket POs or requirements contracts used in the auto industry in Michigan at that time. On this point, the district court cited *Hudson v. Tektronix, Inc.*,

No. 1631, 1982 WL 3704 (Ohio Ct. App. 2d Dist. Apr. 1, 1982), but *Hudson* is readily distinguishable from the instant case. For one thing, *Hudson* involved a different industry (computer graphics products rather than automotive parts), and the plaintiff there was on a salary and bonus-incentive plan rather than straight commissions like Urban. More importantly, unlike ¶ 10 of the Urban-Standex agreement (governing post-termination commissions), the 1977-78 incentive plan in *Hudson* provided, "This plan is intended to pay a commission [only] on product orders *which result in a customer invoice.*" *Id.* at *2 (emphasis added). In addition, unlike the Urban-Standex agreement, the incentive plan in *Hudson* made clear how booked orders were different from invoiced/shipped orders: "Although commission is due and payable upon issuance of an invoice . . . commission will be paid, as an advance[,] on booked orders." *Id.*

B.

Standex contends that the agreement's term "orders booked" was equivalent to "shipment orders" or "release orders." Under that interpretation, it owes commissions only for orders actually shipped on or before the termination date. Standex also emphasizes that customers typically began by placing blanket orders, which did not directly or immediately effect the sale or shipment of any products. Rather, a customer did not commit to buying a specific quantity of a specific product until and unless it submitted an order "against" the blanket order, at which time Standex manufactured and shipped the products (issuing a "shipment order" or "shipment release") and invoiced the customer.

Urban responds that (1) "orders booked" is a separate and distinct concept from "shipment orders" and "release orders"; (2) Standex drafted the agreement, and if it wanted to predicate Urban's

right to post-termination commissions on shipments rather than orders booked, it could have done so; (3) the Standex official who drafted the agreement, Johnson, stated that his understanding and intention was that Urban would receive commissions for the life of the PO obtained by Urban; and (4) absent a contractual limitation on the period of time for which a representative is entitled to commissions for a booked order, the common industry understanding is that the representative receives commissions for the "life of the part" – which is potentially longer than even the "life of the order," may last for many shipments, and may extend well past the termination of the agreement.

## C.

At Ohio common law generally,

> courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.[3]  * * *  Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions.

*L & M of Stark Cty., Ltd. v. Lodano's Footwear, Inc.*, No. 2006-CA-91, 2006 WL 3290797, at*6 ¶ 70 (Ohio Ct. App. 5th Dist. Nov. 13, 2006) (quoting *Shifrin v. Forest Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)).  The Ohio courts caution that the mere "fact that parties may adopt conflicting interpretations of a contract between them while involved in litigation will not create ambiguity or a basis for unreasonable interpretation of the language and original intent of the parties where no

---

[3]*See also Marron v. USAA Cas. Ins. Co.*, No. CA2005-07-204, 2006 WL 1211210, at *1 ¶ 9 (Ohio Ct. App. 12th Dist. May 8, 2006) ("The intent of the parties is paramount in guiding judicial construction of contracts.") (citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.*, 714 N.E.2d 898, 900 (Ohio 1999)), *app. not allowed*, 854 N.E.2d 1092 (Ohio 2006).

such ambiguity should reasonably be found." *Ohio Water Dev. Auth. v. W. Res. Water Dist.*, 776 N.E.2d 530, 535 ¶ 25 (Ohio Ct. App. 10th Dist. 2002).

Rather, a contract term is ambiguous "if it is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning." *Beverly v. Parilla*, 848 N.E.2d 881, 886 (Ohio Ct. App. 7th Dist. 2006); *see also, e.g., State Farm Mut. Auto. Ins. Co. v. Webb*, 562 N.E.2d 132, 140 (Ohio 1990) (Resnick, J., concurring in part and dissenting in part) ("[T]he meaning of 'legally entitled to recover is susceptible to more than one interpretation. On this basis, the phrase is ambiguous because reasonable minds can reach different conclusions as to its true meaning.").[4]

Whether a contract term is ambiguous is a question of law. *Wells v. C.J. Mahan Const. Co.*, Nos. 05AP-180, 05AP-183, 2006 WL 951444, at*6 ¶ 21 (Ohio Ct. App. 10th Dist. Apr. 11, 2006) (citing *Latina v. Woodpath Dev. Co.*, 567 N.E.2d 262, 264 (Ohio 1991)), *app. not allowed*, 854 N.E.2d 1091 (Ohio 2006). Ohio appellate courts review such legal determinations de novo. *Wells*, 2006 WL 951444 at *6 ¶ 21 (citing *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)).[5]

---

[4]*Cf. Roberts v. Bowers*, 162 N.E.2d 858, 860 (Ohio 1959) (per curiam) ("[A statute] . . . is open to construction only where the language used in the statute requires interpretation, that is, where . . . reasonable minds might be uncertain or disagree as to its meaning.").

[5]*See also Hoog v. Hoog*, No. C-980977, 1999 WL 741818, at *2 (Ohio Ct. App. 1st Dist. Sept. 24, 1999); *Emery v. Emery*, No. 04CA1639, 2005 WL 119936, at *2 ¶ 11 (Ohio Ct. App. 2d Dist. Jan. 21, 2005); *Evans v. Evans*, No. 02-CA-2869, 2003 WL 22053929, at *3 n.1 ¶ b (Ohio Ct. App. 4th Dist. Aug. 22, 2003); *Barnes v. Barnes*, No. 2003-CA-383, 2005 WL 327552, at *1 ¶ 18 (Ohio Ct. App. 5th Dist. Feb. 11, 2005); *Castillas v. Stinchcomb*, No. E04-041, 2005 WL 1845318, at *1 ¶ 7 (Ohio Ct. App. 6th Dist. July 8, 2005); *Durick v. eBay, Inc.*, No. 05-MA-198, – N.E.2d –, 2006 WL 2672795, at *2 ¶ 14 (Ohio Ct. App. 7th Dist. Sept. 11, 2006); *Williams v. Williams*, No. 78193, 2001 WL 823650, at *2 (Ohio Ct. App. 8th Dist. July 12, 2001); *Nationwide Mut. Fire Ins.*

Case No. 06-1279
*Urban Assocs., Inc. v. Standex Electronics, Inc. & Standex Int'l Corp.*

## D.

With these Ohio rules in mind, we turn to the agreement. Only two of its seventeen paragraphs are potentially relevant. Paragraph 10 is most directly on point. It provides,

> *Upon termination by the Company, commissions shall be paid on all orders booked by the Representative and received by the Company in house prior to and including the termination date.* No commissions shall be paid to the representative for orders booked by the Representative and/or received by the Company after the termination date. * * *

(Emphasis added). Paragraph 10 does not define "orders booked," nor does it place any temporal limit on how long Standex must pay commissions for such orders booked. Therefore, we check whether other provisions directly or indirectly shed light on what the parties meant by "orders booked."

We consider ¶ 7, entitled "Commissions," which provides, "[A] commission of 5% shall be paid by the Company to the Representative, as his sole compensation hereunder, on the net sales value . . . of shipments of Products made by the Company into the Territory as long as this Agreement is in effect." But there are several reasons why ¶ 7 does not support Standex's argument that by "orders booked" before termination (¶ 10), it meant "*shipments made* before termination."

First, one can argue that, by its terms, ¶ 7 governs the payment of commissions only before termination, not after, because it addresses the payment of a 5% commission "as long as this agreement is in effect." On this reading, once the agreement has been terminated, ¶ 7 no longer applies, and ¶ 10 controls.

---

*Co. v. Buckley*, No. 06-CA-13-M, – N.E.2d –, 2006 WL 2934275, at *2 ¶ 12 (Ohio Ct. App. 9th Dist. Oct. 16, 2006).

By its terms, ¶ 10 deals specifically with Urban's right to the payment of commissions *in the event that Standex terminates the agreement*, while ¶ 7 contains no such language. Therefore, ¶ 7 can govern post-termination commissions only to the extent that it does not conflict with ¶ 10.

"It is well established in Ohio that where two clauses of a contract appear to be inconsistent, the specific clause prevails over the general." *Lawhorn v. Joseph Toyota, Inc.*, 750 N.E.2d 610, 614 n.1 (Ohio Ct. App. 2d Dist. 2001) (citing *Gibbons-Grable Co. v. Gilbane Bldg. Co.*, 517 N.E.2d 559, 564 (Ohio Ct. App. 8th Dist. 1986) (citing *Hoke v. Marcis*, 127 N.E.2d 54 (Ohio Ct. App. 8th Dist. 1955)).[6] Thus, where ¶ 7 conflicts with ¶ 10, the latter alone determines what Standex must pay after termination. *Cf. Schlegel v. DeCamp*, No. 15-99-20, 2000 WL 791800, at \*4 (Ohio Ct. App. 3d Dist. June 6, 2000) ("We cannot agree . . . that the general terminology employed in paragraph four of the managerial contract takes precedence over and negates the specific provision of paragraph ten. \* \* \* Also, the record reflects that Appellant is responsible for having drafted the agreements . . . and any ambiguity between this section and any other section . . . must be strictly construed against Appellant.").

Moreover, suppose we read ¶ 7 to preclude Urban from receiving commissions on products that were (1) bought under an order that was both booked and received by Standex before

---

[6]*See, e.g., Nezhad v. Kilgore*, No. 98-CA-3, 1999 WL 913, at \*4 (Ohio Ct. App. 4th Dist. Dec. 18, 1998) ("the specific metes and bounds description in the appellants' deed prevails over the deed's general description" of the land); *Sandusky Hsg. Trust Ltd. P'ship v. Bouman Group*, No. 91AP-1249, 1992 WL 158460, at \*3 (Ohio Ct. App. 10th Dist. June 30, 1992) (provision that generally authorized a partner to make a contract that binds the whole partnership yielded to more-specific provision that required prior written consent of all partners for any contract that disposed of an interest in the partnership); *City of Columbus v. State Emp. Relations Bd.*, No. 90AP-87, 1990 WL 129254, at \*4 (Ohio Ct. App. 10th Dist. Sept. 4, 1990) (CBA's general seniority provision yielded to provision that specifically dealt with "seniority points").

termination but (2) shipped after termination. That would render meaningless ¶ 10's mandatory directive, "Upon termination by the Company, commissions *shall be paid* on all orders booked by the Representative and received by the Company in house prior to and including the termination date." (Emphasis added.) Such a construction would violate Ohio's "fundamental [rule] that a contract should be construed so as to give effect to *all* its provisions." *Gibbons-Grable Co.*, 517 N.E.2d at 564 (emphasis in original) (citations omitted); *see also Farmers Nat'l Bank v. Delaware Ins. Co.*, 94 N.E. 834, 839 (Ohio 1911) (applying the "plain rule of construction . . . that every provision of a contract shall be given effect if possible"); *Ford Motor Co. v. John L. Frazier & Sons Co.*, 196 N.E.2d 335, 337 (Ohio Ct. App. 8th Dist. 1964) ("In construing a written instrument, effect should be given to all of its words . . . .").

For these reasons, where ¶ 7 ("Commissions") conflicts with ¶ 10 ("Termination") as to post-termination commissions, ¶ 10 must prevail as a matter of law.

E.

No other provisions of the agreement shed light on what the parties meant by ¶ 10's "orders booked." Accordingly, Ohio law permits the court to consider extrinsic evidence, "i.e., evidence outside the four corners of the contract." *Lake Erie Towing v. Troike*, No. E-05-62, 2006 WL 2790334, at *2 ¶ 13 (Ohio Ct. App. 6th Dist. Sept. 29, 2006); *cf. Inland Refuse Transfer Co. v. Browning Ferris Indus., Inc.*, 474 N.E.2d 271, 272 (Ohio 1984) ("[I]f a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term.") (citing *Hallet & Davis Piano Co. v. Starr Piano*, 97 N.E. 377 (Ohio 1911)).

–17–

Such extrinsic evidence may include the circumstances surrounding the parties at the time they entered into the contract, the objectives they intended to accomplish, and any acts by the parties that demonstrate how they construed the ambiguous term. *Blosser v. Cartre*, 586 N.E.2d 253, 255-56 (Ohio Ct. App. 4th Dist. 1990) (quoting *Mosier v. Parry*, 54 N.E. 364, syllabus ¶ 1 (Ohio 1899)). Obviously, extrinsic evidence may include a contracting party's own statement about what he understood the disputed contract term to mean when he wrote, negotiated, or signed the contract.

Urban introduced two pieces of extrinsic evidence to support its reading of ¶ 10's "orders booked and . . . received . . . prior to and including the termination date." Standex does not persuasively refute either piece of extrinsic evidence – let alone *conclusively* refute them so as to take the issue away from the jury through summary judgment.

First, Urban introduced the testimony of an expert witness, Charles Mathews, as to how the term "orders booked" was used and understood in the industry – specifically, whether orders booked was considered to be the same as shipment orders or release orders as urged by Standex. Mathews started out as a sales representative in 1965 and became a partner in a sales firm in 1980; since 1980, he managed the firm and continued to actively sell on behalf of a changing roster of fifteen to eighteen manufacturers. Mathews had been personally involved in negotiating twenty to twenty-five sales-representative contracts since the early 1970s.

Mathews testified that if an agreement did not specify the representative's entitlement to post-termination commissions, the default was that the manufacturer was "obligated to pay post-termination commissions for the life of the part." Mathews also testified that he understood "orders booked" to mean orders secured by the representative for the company, regardless of whether they

–18–

are original orders or reorders, so long as they are for the same part as in the order originally booked. On cross-examination, Mathews testified further that in his experience, an auto-part manufacturer who hires a representative would understand "orders booked" to entitle the representative to commissions for the "life of the part," even after termination.

Standex did not challenge Mathews' qualifications as an expert in the field of automotive sales-representative contracts and commissions. Standex did not introduce expert testimony contradicting Mathews' testimony that the default understanding, even without contractual language governing post-termination commissions, was that a representative was entitled to commissions for the life of the part, i.e., so long as that same part was purchased pursuant to the order originally secured by the representative. Nor did Standex introduce expert testimony to contradict Mathews' testimony that "orders booked" would be commonly understood to refer to such post-termination life-of-the-part commissions.

Perhaps most damaging to Standex is the deposition testimony of its own VP of Sales and GM, Charles Johnson. Johnson testified that he drafted the agreement, and that the parties never discussed the definition of "orders booked" before signing the agreement:

> Q.      Take a look at Exhibit 8 again.  This is a Sales Representative Agreement
>           between Standex and Urban and Associates, correct?
> A.       Right.
>
> Q.      And *you were involved in drafting the agreement?*
> A.       *Yes.*
>
> Q.      *What role did you play in drafting it?*
> A.       *I essentially wrote this document* with the approval of the corporate lawyers
>           while I was with Standex Electronics.

> Q. Look at page 4 of the document, Exhibit 8, paragraph 10. It talks about commissions will be paid upon termination?
>
> * * *
>
> Q. *Do you have a specific recollection of defining orders booked in your discussions with Urban when this agreement was entered into?*
>
> A. *No, sir, I do not.*

(Emphasis added).

In Standex's favor, we note that Johnson did testify that Standex would not have promised to pay post-termination commissions for the life of the *part*:

> Q. You said in your testimony Standex would not agree to a life of a part commission contract. I believe you said that.
>
> A. I don't believe they would. I would not have.
>
> Q. Why would you not?
>
> A. Well, simply because if you agree to a life of product or a part number, and let's say Craig [Urban] sold it last year, and they're going to use it for the next ten years and he leaves me as a rep or I fire him as a rep . . . .

Standex can cite this as evincing an understanding, on its part, that is contrary to the "life of the part" commission arrangement that Urban's expert testified was the industry default.

But Johnson goes on to directly contradict Standex's position that commissions on "orders booked" means that Urban is entitled to post-termination commissions only on products that actually shipped before termination, i.e., that an "order booked" is synonymous with a shipping release. Johnson had this exchange with Urban's counsel:

> Q. With regard to an order, and in that instance you were not talking about only paying on shipping releases, fair statement?
>
> A. That is correct.
>
> Q. And so an order booked would not be a shipping release?
>
> A. No, sir.

Case No. 06-1279
*Urban Assocs., Inc. v. Standex Electronics, Inc. & Standex Int'l Corp.*

Johnson also stated, in response to his own counsel's questioning, that he intended Urban to receive post-termination commissions on products that were (1) shipped after termination (2) pursuant to a purchase order received before termination (3) *for the life of the purchase order*. Johnson had this exchange with Standex's counsel:

> Q.   And it says, "Upon termination by the Company, commissions shall be paid on all orders booked by the Representative and received by the Company in house prior to and including the termination date"?
> A.   Yes.
>
> Q.   Are you familiar with the term life of the part commissions, or life –
> A.   We never entered into a life of the part commission with anyone.
>
> Q.   *Do you view that, this termination language to mean that commissions will be paid for life of the part –*
> A.   *No.*
>
> Q.   – following termination?
> A.   *I interpreted it to mean life of the purchase order.* Purchase orders are negotiated basically on an annual agreement-type basis, and they will issue a purchase order that says for 100 percent or 80 percent or whatever percentage [of the customer's requirement] they want to give you of that product in accordance with the shipping releases are to be shipped in accordance with shipping releases [sic].

(Emphasis added); *see also* Johnson's deposition statement that he intended to pay commissions on "orders as they existed at the time of the effective date of termination" until and unless the PO changed in terms of part design or price). *Cf. Bhavnani v. I.D. Voldness*, No. 95-AP-E03-284, 1995 WL 578124, at *4 (Ohio Ct. App. 10th Dist. Sept. 28, 1995) (in dispute over interpretation of contract term, court noted, "appellant's own testimony contradicts the position asserted by appellant's counsel in the brief. Statements of counsel do not constitute evidence.").

–21–

Reading the agreement as a whole and considering all the extrinsic evidence, a reasonable factfinder could conclude that the parties intended Urban to receive post-termination commissions at least for the life of the POs that were received prior to the termination date. Indeed, it might be difficult for a factfinder to conclude that the parties did *not* intend the agreement to give Urban a right to commissions at least for the life of the purchase order – the very Standex official who drafted the agreement testified that he understood the agreement to guarantee commissions to that extent.

Lastly, Standex drafted the agreement. If Standex wished to limit post-termination commissions to products shipped before termination, it could have made that clear in ¶ 10. Similarly, if Standex wished to impose a temporal limit on post-termination commissions, it could have made that clear in ¶ 10.

But Standex used the term "orders booked" instead of referring to "products shipped" or "shipment releases," failed to define "orders booked," and failed to include a temporal limit on post-termination commissions. By these acts and omissions in drafting the agreement, Standex did nothing to dispel the impression that it intended to pay Urban post-termination commissions for the life of the PO (as Standex's own Vice-President intended) or even for the life of the part (which Urban's expert testified was the default arrangement in the industry). Standex thus cannot escape the long-settled principle of Ohio law that

> everything is to be taken most strongly against the party who prepared the contract – the one who, in the absence of proof to the contrary, created the doubt, which in this case is the defendant. He who speaks in a written contract prepared by himself should speak plainly and, failing to do so, must abide the natural and legal results of such failure.

*Coe v. Suburban Light & Power Co.*, 167 N.E. 693, 695 (Ohio Ct. App. 1929).

The district court erred in concluding that the term "orders booked" was not ambiguous, and Urban presented ample evidence from which a reasonable factfinder could adopt one of its two preferred interpretations of the term. "[W]hen contract terms are ambiguous and one interpretation supports some recovery for plaintiff, the trial court may not enter summary judgment for defendant." *Durick v. eBay, Inc.*, No. 05-MA-198, 2006 WL 2672795, ¶ 14 (Ohio Ct. App. 7th Dist. Sept. 11, 2006). Accordingly, we conclude that the district court erred in granting summary judgment to Standex on the breach-of-contract claim contained in count one.

VI.

The district court ruled as follows on Urban's claim for bad-faith termination of the agreement (count one, part two):

> Plaintiff relies on the case of *Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078 (D. Ohio 1992), which held that "'where a principal has the right to terminate the authority of an agent at any time, such principal may not do so in bad faith as a device to escape the payment of a broker's commission.'" *Davis . . .* [at] 1087 . . . (quoting *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975)). Were the Court to hold likewise, despite what may be contrary authority from the Ohio Supreme Court, *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270 (1999) (a court may not construe an implied covenant that a contract is only terminable for cause, when the contract expressly states that it is terminable without cause), Plaintiff's claim would still fail. The duty of good faith found by *Davis*, does not prevent Standex from terminating the agreement to prevent paying commissions which Plaintiff has not yet earned but might earn if Standex were to decide to continue to utilize Plaintiff's services:
>
>> In no manner, however, can it be deemed bad faith for the Defendant to have terminated the relationship between the parties in an effort to cut off commissions for orders which had not yet been placed and for which the Plaintiff had expended no effort. As a matter of law, the Plaintiff is not entitled to commissions on such future orders as it cannot be said that the decision of [the defendant] to terminate the relationship in an effort to escape payment of those commissions is anything but sound business judgment.

> *Davis*, 796 F. Supp. at 1088 n.7. It is not bad faith to exercise the right to avoid paying future commissions by no longer relying on sales representatives. Neither is it bad faith to terminate the agreement when Plaintiff has expended effort to develop business but will not receive commissions on that business because he has not yet "booked" orders for it. These are rights provided by the contract. [citation to filings omitted] Standex did not suddenly terminate the contract just before Plaintiff's commissions were to vest. Standex gave Plaintiff 60 days' notice prior to termination.

Op. at 8-9.[7] *See also Apex Sales Agency, Inc. v. Mather Co.*, No. 60344, 1992 WL 354816, at *10 (Ohio Ct. App. 8th Dist. Nov. 19, 1992) ("[T]he explicit language of both contracts provided that written notice of termination could be given by either party at any time. * * * Mather's termination [of industrial-parts sales rep] was not executed in bad faith, or as a means to avoid a commission.").

The district court properly granted summary judgment to Standex on the bad-faith termination claim. We need not decide whether the district court's stated reason was correct, however, because Standex was entitled to summary judgment on this claim for a different reason: under Ohio common law, Urban was not Standex's agent. Therefore, any cause of action recognized by Ohio for bad-faith breach of an agency contract does not apply. In Ohio,

> [a]n agency relationship contains three essential attributes. *First, the agent must have the power to alter the legal relations between the principal and third parties.* Restatement (Second) of Agency § 12; *Funk v. Hancock*, . . . 498 N.E.2d 490, 493-94

---

[7]*Contrast Baker v. Modene*, No. WD-97-112, 1998 WL 336314, at *2 (Ohio Ct. App. 6th Dist. June 12, 1998) ("Here, appellee secured an executed purchase agreement at her expense, and she was denied compensation by appellants only because the closing was not scheduled prior to her termination date. * * * [W]e find that the trial court properly denied appellants' motion for summary judgment . . . ."); *Hsing Chow v. Union Central Life Ins. Co.*, 457 F. Supp. 1303, 1309 (E.D.N.Y. 1978) (former insurance agent who alleged bad-faith termination aimed specifically at avoiding payment of service fees that were due to plaintiff for the renewal of policies he had previously obtained, sufficiently stated cause of action for breach of agency contract under Ohio law) (citing *Smith v. Frank R. Schoner, Inc.*, 115 N.E.2d 25, 27 (Ohio Ct. App. 9th Dist. 1957) and *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383 (6th Cir. 1975)).

([Ohio Ct. App. 12th Dist.] 1985). Second, the agent must be a fiduciary of the principal in matters within the scope of the agency. Restatement (Second) of Agency § 13. Third, the principal must have the right to control the agent's conduct of matters entrusted to her. Restatement (Second) of Agency § 14; *Hanson v. Kynast*, . . . 494 N.E.2d 1091, 1094 ([Ohio] 1986).

*Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 219 (6th Cir. 1992) (emphasis added).

The agreement recites that "[t]he Representative shall be the agent of the Company . . . ." SRA ¶ 3 ("Authority"). In determining the existence of an agency relationship, however, substance controls over form, and conclusory assertions of agency must yield to the rights and powers that the alleged principal has actually given the alleged agent (or allowed the alleged agent to exercise). As this court noted in another sales-representative case:

> [W]e observe that the [sales agreement] unambiguously declared that Eyerman would not be [defendant]'s agent. Eyerman correctly points out, however, that we must look beyond the agreement to the reality of the relationship between the parties.
>
> Turning to the first essential element [of agency under Ohio law], we find that Eyerman did not have the legal power to bind [defendant]. The [agreement] stated:
>
>> Nothing in this Agreement shall be deemed to permit or empower [Eyerman] to conduct business in the name of, or on account of, [defendant], or to incur or assume any expense, debt, obligation, liability, tax or responsibility in behalf of, or in the name of [defendant] or to act in [defendant's] behalf or to bind [defendant] in any way whatsoever.
>
> Comment a to section 12 of the Restatement explains that a person possesses the requisite legal power if he or she could: (1) bind the principal in contract with a third person; (2) divest the principal of interest in a thing, such as selling the principal's goods to a third person; (3) acquire new interests for the principal; or (4) subject the principal to tort liability by injuring a third person.
>
> Eyerman has not established a genuine issue of material fact as to her ability to alter [defendant]'s legal relations. * * * Eyerman could not bind [defendant] to a contract with a third party. Similarly, Eyerman could not bind [defendant] to sell its products to third parties; . . . . There is no contention that Eyerman could purchase interests

–25–

on behalf of [defendant] or that she could subject [defendant] to tort liability by injuring a third party.

*Eyerman*, 967 F.2d at 219.

Likewise here, Urban has not established a genuine issue of material fact as to its ability to alter Standex's legal relations. Urban could not bind Standex to a contract with a third party or bind Standex to sell its products to a third party. The same paragraph of the agreement that purports to make Urban an "agent" also contains a limitation that is fatal to Urban's claim of legal agency status:

> The Representative shall be the agent of the Company *for the sole purpose of soliciting and receiving orders for the Products* in accordance with the then current prices, terms, product representations and warranties of the Company. Unless specifically authorized by the Company, the Representative shall not have any authority to alter, enlarge or limit any of the then current prices, terms, product representations or warranties of the Company or make any other terms, product representations, warranties or allowances with respect to any of the Products.

SRA ¶ 3 ("Authority") (emphasis added).

Not only did Urban lack the authority to offer different prices, terms, or warranties to potential customers, it lacked the contractual authority to make a contract on Standex's behalf even at the pre-specified prices, terms, and warranties. Urban merely promoted Standex's products in an effort to induce the potential customer to submit an RFQ.

Then, if Standex conveyed a quotation to the potential customer and the potential customer responded by making an offer to buy products, Urban had no authority to accept or reject the offer. The provision entitled Acceptance of Orders made clear that "[a]ll orders are subject to acceptance or rejection *by the Company* at its divisional office stated above . . . . * * * The Company shall also have the right to fix the terms and/or conditions on which it will accept any orders solicited by the Representative." SRA ¶ 4 (emphasis added). Furthermore, the provision entitled Terms of Sale

stated that *"[t]he Representative shall not accept orders in the name of the Company* or make price quotations or delivery promises without the prior approval of the Company." SRA ¶ 5 (emphasis added).

For these reasons, Urban was not Standex's agent under Ohio common law, so Urban could not avail itself of any cause of action for bad-faith termination of an agency contract. Thus, even if the district court's stated reason for granting summary judgment on the bad-faith termination claim was incorrect under Ohio law, we affirm summary judgment on that claim. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 445 (6th Cir. 1999) ("an appellate court may affirm a district court where the district court reached the right result for the wrong reason") (citing *Union CATV v. City of Sturgis*, 107 F.3d 434, 442 (6th Cir. 1997)).[8]

## VII.

The district court also granted summary judgment to Standex on count two, implied contract and *quantum meruit* / unjust enrichment. In Ohio, an action for unjust enrichment will lie where a party retains money or a benefit that in equity or justice belongs to someone else. *Eyerman*, 967 F.2d at 222 (citing *Hummel v. Hummel*, 14 N.E.2d 923, 926-27 (Ohio 1938)). To establish unjust enrichment, a plaintiff must show that he conferred a benefit on the defendant, that the defendant

---

[8]The Ohio and Michigan courts take this view as well. *See State v. Blankenship*, 526 N.E.2d 816, 819 (Ohio 1988) ("Accordingly, the court of appeals reached the correct result even though for the wrong reason and its judgment is affirmed."); *Gleason v. DOT*, 662 N.W.2d 822, 824 (Mich. Ct. App. 2003) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.") (citing *Mulholland v. DEC Int'l Corp.*, 443 N.W.2d 340, 347 n.10 (Mich. 1989)).

knew about the benefit,[9] and that under the circumstances, it would be inequitable for the defendant

to retain the benefit without paying plaintiff for its value. *Seal Master Indus., Inc. v. Bay Area Seal*

*Coating & Stripping*, No. L-05-1186, 2006 WL 1941528, at *6 ¶ 42 (Ohio Ct. App. 6th Dist. July 14,

2006) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)).[10]

Nevertheless, absent fraud, illegality, or bad faith, a party to an express agreement may not

bring a claim for unjust enrichment, particularly when the express agreement contains a provision

governing the allegedly inequitable conduct of the other party. *Sammarco v. Anthem Ins. Cos., Inc.*,

723 N.E.2d 128, 137 n.26 (Ohio Ct. App. 1st Dist. 1998) (citing, *inter alia*, *Aultman Hosp. Ass'n*

*v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989)).[11]

---

[9]*See Morgan v. Mikhail*, Nos. 04AP-195, 04AP-196, 2004 WL 2445219, at *8 ¶ 24 (Ohio Ct. App. 10th Dist. Nov. 2, 2004) (investor failed to state an unjust-enrichment claim against investment advisor's father, who allegedly allowed advisor to transfer money into his account, where investor made no allegation that father knew the money belonged to the investor).

[10]*See, e.g., Video Discovery, Inc. v. Passov*, No. 86445, 2006 WL 562148, at *3 ¶ 16 (Ohio Ct. App. 8th Dist. Mar. 9, 2006) ("Plaintiff provided a valuable service – videotaping a medical expert witness's deposition for more than three hours – to defendant. Although defendant was not satisfied in every respect with that service, and now unreasonably blames plaintiff's conduct in large part for his client's loss at trial, he derived a benefit from it, and now must pay for it.").

[11]*See, e.g., Davidson v. Davidson*, No. 17-05-12, 2005 WL 3274853, at *4-5 ¶¶ 18-19 (Ohio Ct. App. 3d Dist. Dec. 5, 2005) ("[S]ince the promissory note includes how it is to be enforced, the equitable doctrine of unjust enrichment does not apply, because Appellant could recover based upon the terms of the promissory note."); *Boston v. Sealmaster Indus.*, No. E-03-040, 2004 WL 1810324, at *8 ¶ 38 (Ohio Ct. App. 6th Dist. Aug. 13, 2004) ("A recovery for unjust enrichment could not occur . . . as a matter of law, because an actual contract existed concerning the chassis; therefore, a quasi contract did not exist."); *Cleveland Mack Leasing, Ltd. v. Chef's Classics, Inc.*, No. 05-MA-59, 2006 WL 459269, at *5 ¶ 35 (Ohio Ct. App. 7th Dist. Feb. 24, 2006) (lease provision that allowed creditor to require debtor to make all delinquent payments and purchase the vehicles, did not unjustly enrich the creditor) ("[S]ince . . . a written contract existed between the parties and there was no allegation of fraud or illegality, the trial court did not err in finding that [the] unjust enrichment claim failed."); *Struna v. Ohio Lottery Comm'n*, No. 03AP-787, 2004 WL 2361570, at *5 ¶ 22 (Ohio Ct. App. 10th Dist. Oct. 21, 2004) ("The amount of money plaintiff was entitled to with respect to his

Urban's complaint alleges that Standex is acting in bad faith when it refuses to pay commissions on products that were (1) shipped after the termination date (2) pursuant to orders booked before the termination date, *see* ¶ 19. Neither the district court opinion nor Standex's appellate brief addresses whether Urban's allegations of bad faith are sufficient to allow it to assert an unjust-enrichment claim notwithstanding the existence of an express contract covering the same ground (Urban's entitlement to the disputed commissions).

Where there is an express agreement, the party claiming unjust enrichment must prove fraud or bad faith by clear and convincing evidence. *Ullman v. May*, 72 N.E.2d 63, 67 (Ohio 1947). Based on this record, we cannot say that Urban has shown a genuine issue as to whether it can convince a jury *by clear and convincing evidence* that Standex acted in bad faith in advancing its interpretation of the agreement. Accordingly, the district court did not err in holding that the existence of an express agreement that addresses post-termination commissions, prevents Urban from pursuing an unjust-enrichment / *quantum meruit* claim as to those same commissions.

## VIII.

The district court disposed of Urban's tortious-interference claim (count three) as follows:

> Plaintiff is correct that Michigan law provides a cause of action for tortious interference with . . . an employee's at-will employment contract, such as is the case with Ms. Falzone. *See Health Call v. Atrium Home & Health Care Servs.*, [706 N.W.2d 843] ([Mich. Ct. App.] 2005).[12] Nevertheless, Plaintiff has not suffered any

---

52 winning tickets, which is the subject matter of plaintiff's unjust enrichment claim, was governed by the terms of the contract between plaintiff and the Lottery Commission. Consequently, the unjust enrichment doctrine has no application . . . ."), *app. not allowed*, 823 N.E.2d 458 (Ohio 2005).

[12]*See, e.g., Martinez v. Mueller*, No. 266200, 2006 WL 1115534, at *2 (Mich. Ct. App. Apr. 27, 2006) (recognizing that *Health Call* overruled *Environair, Inc. v. Steelcase, Inc.*, 475 N.W.2d 266 (Mich. Ct. App. 2001) "to the extent that *Environair* is read as limiting recovery to

–29–

> damages as a result of Standex's inducement of Ms. Falzone [sic] to leave Plaintiff. The only client that Plaintiff lost in connection with Standex's actions was Standex . . . and it is clear that Standex terminated its agreement with Plaintiff because it wanted to cease relying on sales representatives. Plaintiff would have lost Standex as a client even if Ms. Falzone had decided not to leave Plaintiff's employment.

Op. at 9-10. The district court's reasoning is basically[13] sound, and Urban's criticisms are unpersuasive.

We first note that, even if Urban were able to show a genuine issue as to actual damages, it still could not sustain a claim for tortious interference. To establish the third element of a tortious interference claim under Michigan law, Urban has to prove that Standex committed "a *per se* wrongful act or committed a lawful act with malice and without justification 'for the purpose of invading the contractual rights or business relationship of another.'" *Pineau v. Comau PICO*, No. 03-74708, 2006 WL 846750, at *2 (E.D. Mich. Mar. 31, 2006) (quoting *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003)); *see also Stanton v. Dachille*, 463 N.W.2d 479, 483 (Mich. Ct. App. 1990) (quoting *Feldman v. Green*, 360 N.W.2d 881 (Mich. Ct. App. 1984)). A *per se* wrongful act is one that is "inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992) (citing *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289 (Mich. Ct. App. 1988)).

---

nominal damages as a matter of law in all cases . . . arising out of or related to the termination of at-will contracts"); *Everton v. Williams*, 715 N.W.2d 320, 321 (Mich. Ct. App. 2006) (same).

[13]We express no opinion with regard to the district court's finding that "Plaintiff would have lost Standex as a client even if Ms. Falzone had decided not to leave Plaintiff's employment." Op. at 10. The correctness of that finding does not affect the ground on which we affirm summary judgment on the tortious-interference claim.

The weight of Michigan authority holds that when the defendant's actions are motivated by legitimate business reasons, its actions do not constitute improper motive or interference. *See Prysak*, 483 N.W.2d 629 (citing *Formall*, 421 N.W.2d 289, and *Christner v. Anderson, Neitzke & Co., P.C.*, 401 N.W.2d 641 (Mich. Ct. App. 1986), *modified o.g.*, 444 N.W.2d 779 (Mich. 1989)); *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597-98 (Mich. Ct. App. 2003) (citing *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) (citing *Mich. Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.*, 438 N.W.2d 349, 355 (Mich. Ct. App. 1989))).[14] By all accounts, the reason Standex terminated the agreement and began using its own

---

[14]*But see Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451 (Mich. Ct. App. 1989), declining to hold that a defendant whose alleged tortious interference was motivated by legitimate business interests was *necessarily* free of liability. In addition to motive, that panel of the Michigan Court of Appeals advised consideration of these factors: (1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the respective interests [sic] of the plaintiff and the defendant, and (4) the proximity of the defendant's conduct with the interference. *Id.* at 462-63 (citing 4 <u>Restatement of Torts 2d</u> § 767 at pp. 26-27 and cmts. thereto).

The Michigan Supreme Court has never cited *Jim-Bob*. Moreover, only an *unpublished* Michigan Court of Appeals decision has adopted *Jim-Bob*'s view that legitimate business motive does not necessarily preclude liability for tortious interference. *See Irwin v. Durussel & Durussel, Inc.*, Nos. 205706, 205712, 1999 WL 33443482 (Mich. Ct. App. June 1, 1999). The only published Michigan Court of Appeals decision to cite *Jim-Bob* merely noted the conflict between it and *Christner*. *See Wood v. Herndon & Herndon Investigations, Inc.*, 465 N.W.2d 5, 8 (Mich. Ct. App. 1990).

A panel of this court did endorse *Jim-Bob*'s approach to tortious-interference claims:

> The approach taken by the Court of Appeals in *Jim-Bob* seems entirely consistent with that taken by the Supreme Court in *Wilkinson v. Powe*, 300 Mich. 275, 1 N.W.2d 279 [(1942)]. There, it will be recalled, the Supreme Court said that there can be no categorical answer to the question of what will constitute justification, "and it is usually held that this question is one for the jury." *Id.* at 283, 1 N.W.2d 279.

*Tata Consultancy Servs. v. Systems Int'l, Inc.*, 31 F.3d 416, 427 (6th Cir. 1994). Even *Tata*, though,

employees instead of outside representatives was to avoid paying commissions. That is a legitimate business motive, so Standex cannot be liable for tortious interference with the Urban-Falzone relationship.

Even if Standex could satisfy the third element of tortious interference under Michigan law, it cannot satisfy the fourth: damages. In an effort to show that it presented sufficient proof of actual damages, Urban points out that "Falzon[e], Urban's former employee, admitted that she had a good relationship with Urban and was not seeking other employment." This is accurate, but beside the point. Even if we assume that Falzone would have remained an Urban sales rep for the rest of her work-life, absent Standex's blandishments, there is no reason to believe that Falzone's refusal to leave Urban would have caused Standex not to terminate the agreement. By terminating the agreement and using an employee to solicit RFQs, Standex saves on commissions regardless of whether Falzone or someone else is the employee doing the soliciting.

Urban also states that "Standex's own emails establish that Standex hired Falzon [sic, Falzone] prior to its termination of Urban, not 'shortly after' as Standex claimed below." This may be true, but it does not help Urban show a genuine issue as to actual damages suffered from the alleged tortious interference.

Urban may be speculating that Standex would not have terminated its agreement with Urban until and unless it was able to hire Falzone. Even if that were true, it does not mean that either half of that process was legally actionable: Urban has not demonstrated that Standex acted tortiously in

held that in order to show tortious interference, the plaintiff had to show that the defendant "thereby took away business that [the plaintiff] would not have lost otherwise . . . ." *Tata*, 31 F.3d at 429. Urban has not made that showing here.

convincing at-will employee Falzone to "jump ship" (this count), or in terminating the agreement once it had secured Falzone's services as its own employee (count one, part two). The district court properly granted summary judgment on the tortious-interference claim.

IX.

Count four merely sought declaratory relief on counts two and three. Because it was proper to grant summary judgment to Standex on counts two and three, it was proper to do so on count four.

X.

For the foregoing reasons, we reverse summary judgment as to the breach-of-contract claim (count one, part one), but affirm summary judgment for Standex on Urban's other claims.